The PEOPLE of the State of Colorado, Plaintiff–Appellant

v.

Tommy COWART, Defendant–Appellee.

No. 10SA214.

Supreme Court of Colorado, En Banc.

Dec. 13, 2010.

Carol Chambers, District Attorney, Eighteenth Judicial District, David C. Jones, Senior Deputy, Centennial, Colorado, Attorneys for Plaintiff–Appellant.

Douglas K. Wilson, Public Defender, Scott Schultz, Deputy Public Defender, Centennial, Colorado, Attorneys for Defendant–Appellee.

Justice MARTINEZ delivered the Opinion of the Court.

In this interlocutory appeal filed pursuant to C.A.R. 4.1, the People challenge the trial court's suppression of statements made by the defendant Tommy Cowart. The trial court found that, for the purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Cowart was in custody during a pre-arrest interview at his home on the night of August 29, 2009. Because the lead investigator, Marshal Sean Daniels, failed to adequately advise the defendant of his *Miranda* rights prior to formal arrest, the court suppressed all statements made during the pre-arrest interview. The trial court's order also prohibited Marshal Daniels from testifying during the People's case in chief.

We reverse the suppression order. Applying an objective test for determining custody, *see People v. Matheny*, 46 P.3d 453 (Colo. 2002), we find that Cowart was not in custo-

dy during the pre-arrest interview with Marshal Daniels. Moreover, we find no legal basis supporting the trial court's decision to prohibit the People from calling Marshal Daniels during its case in chief.

## I.

On August 29, 2010, Hugo Town Marshal Sean Daniels was dispatched to a residence in response to an alleged sexual assault. At approximately 9:00 a.m., Marshal Daniels arrived at the residence of S.L.'s parents. During the ensuing interview with S.L., she alleged that she had been raped by her uncle, Cowart.

At approximately 8:45 p.m. that evening, Marshal Daniels went to Cowart's home with three other police officers. Three of the four officers were in full uniform and armed. Upon finding that Cowart was not at home, Marshal Daniels contacted a neighbor, Hope Belzer, and asked her to call Cowart to inquire when he would be home. During this phone call, Cowart told Belzer that he would be home shortly and asked if the police were there.

Approximately ten minutes later, Cowart arrived at his house. Marshal Daniels approached Cowart and asked if he could talk with him. Cowart responded, "[s]ure, no problem" and handed one of the officers the keys to the home. The officers then assisted Cowart and his wife, who was in a wheelchair, into the residence. With Cowart's permission, Marshal Daniels and two officers went into the residence.

Marshal Daniels then asked Cowart to sit down and began asking questions. During the interview, Marshal Daniels stood about three feet away from Cowart while the two other officers stood near the front door. None of the officers touched Cowart or physically directed his movements. Cowart was not told that he was under arrest or that he was not free to leave. Cowart's wife remained present during the interview and sat across from Cowart.

During the interview, Marshal Daniels tone was conversational. He asked a mix-

ture of open questions and more specific follow-up questions. While Marshal Daniels freely admitted that his questions were designed to elicit incriminating testimony, he did not confront Cowart with the evidence of sexual abuse or otherwise accuse him of any crime. Nonetheless, during the interview, Marshal Daniels noticed that Cowart appeared nervous and shaky.

Near the end of the interview, Marshal Daniels asked Cowart if he could see the underwear he had on. In response, Cowart dropped his pants. As a result, Marshal Daniels was able to determine that Cowart's underwear matched the description given by S.L. earlier that day.

At this point, Marshal Daniels stepped outside and informed one of the officers that he had probable cause to arrest. He then returned into the home, arrested Cowart for the sexual assault of S.L., and advised Cowart of his *Miranda* rights. Cowart expressly stated that he no longer wanted to talk to law enforcement and requested an attorney.

On November 11, 2009, Marshal Daniels re-contacted Cowart while he was being held in custody at the Lincoln County Jail. Even though Marshal Daniels knew that Cowart had refused to speak with officers and was represented by counsel, Marshal Daniels did not attempt to reach Cowart's attorney, but rather interviewed Cowart for over an hour in a secured room.

Prior to trial, Cowart filed a motion to suppress, among other things, statements made during the pre-arrest and jail-house interviews with Marshal Daniels. Cowart argued that the police had failed to provide him with a *Miranda* advisement prior to the pre-arrest interview in violation of his Fifth Amendment rights. Cowart also argued that the jailhouse interview violated his Fifth and Sixth Amendment rights. The People conceded that the jailhouse interview did violate Cowart's Fifth and Sixth Amendment rights. The People also conceded that Cowart was interrogated within the meaning of *Miranda* during the pre-arrest interview. However,

the People argued that a pre-arrest *Miranda* advisement was unnecessary because the statements made by Cowart during the pre-arrest interview were voluntary and non-custodial.

The trial court conducted hearings on May 7, 17, and June 2, 2010. In a June 16 Written Order, the trial court found that Cowart was in custody at the time of the pre-arrest interview for the purposes of *Miranda*. The trial court stated that Cowart "was not free to leave his home, nor were the Officers going to honor a request for them to leave. . . ." Moreover, the trial court noted that Cowart was "nervous and shaking during the interview." Accordingly, the trial court concluded that while Cowart's answers were given voluntarily, he was "effectively in custody and should have been read his *Miranda* rights." Because no *Miranda* advisement was given prior to arrest, the trial court suppressed all of the statements made by Cowart during the pre-arrest interview. Accompanying its suppression ruling, the trial court also prohibited the People from calling Marshal Daniels during its case in chief. The trial court did not, however, provide a clear legal basis for this prohibition.

The People filed this interlocutory appeal to challenge the trial court's suppression of Cowart's pre-arrest statements. The People also challenge that part of the trial court's order prohibiting it from calling Marshal Daniels to testify during its case in chief. We consider each of these issues in turn.

## II.

We reverse the order suppressing the statements made by Cowart during the pre-arrest interview. Considering the totality of the circumstances, no objective person in the circumstances presented here would have found his freedom of action deprived to the degree associated with formal arrest. *See Matheny*, 46 P.3d at 468. Cowart was not therefore in custody during the pre-arrest interview. Accordingly, a *Miranda* advisement was not necessary prior to the formal arrest.

## A.

Whether a particular defendant was in custody for *Miranda* purposes involves an objective test requiring the court to determine "whether a reasonable person in the defendant's position would consider himself to be deprived of his freedom of action to the degree associated with a formal arrest." *Matheny*, 46 P.3d at 468; *see also, People v. Hankins*, 201 P.3d 1215, 1218 (Colo.2009); *People v. Trujillo*, 785 P.2d 1290, 1293 (Colo. 1990). In making this determination, a court is to consider the totality of the circumstances. *Id.; People v. Pascual*, 111 P.3d 471, 476 (Colo.2005). Some of the factors a court should evaluate include:

> (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.

*Matheny*, 46 P.3d at 465–66. The court may also consider whether the officers told the defendant he was free to leave. *See People v. Holt*, 233 P.3d 1194, 1197 (Colo.2010).

The court may not, however, consider subjective factors in making a custody determination. In particular, the court may not consider the "'unarticulated thoughts or views of the officers and suspects' because the custody test is objective in nature." *Hankins*, 201 P.3d at 1219 (quoting *People v. Elmarr*, 181 P.3d 1157, 1162 (Colo.2008)); *see also Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). Similarly, it would be inappropriate for the individual characteristics of the defendant to bear on the objective custody determination. *See Yarborough v. Alvarado*, 541 U.S. 652,

668, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[T]he custody inquiry states an objective rule designed to give clear guidance to the police, while consideration of a suspect's individual characteristics—including his age—could be viewed as creating a subjective inquiry.").

■■■ When a trial court rules on a motion to suppress incriminating statements due to a *Miranda* violation, it engages in both fact-finding and law application. *Hankins,* 201 P.3d at 1218. We defer to the trial court's findings of fact, but we review de novo whether those facts establish that the suspect was in custody during interrogation. *Matheny,* 46 P.3d at 462.

### B.

■■■ We now turn to apply the above factors to the present case. Considering the totality of the circumstances, we are persuaded that Cowart was not in custody during the pre-arrest interview.

To begin with, the lack of physical restraint suggests to us that Cowart was not in custody. There is no evidence that Marshal Daniels or any of the three officers used physical restraint or force on Cowart. *See People v. Breidenbach,* 875 P.2d 879, 886 (Colo.1994) ("One well-recognized circumstance tending to show custody is the degree of physical restraint used by police officers to detain a citizen."). To the contrary, Marshal Daniels asked Cowart, in a conversational tone, for permission to enter his home. Cowart agreed to this request and freely handed the house keys to one of the officers. The officers then helped Cowart and his wife, who was in a wheelchair, into the house. "These are not indicia that would cause a reasonable person to believe that his freedom of action had been curtailed to a degree associated with a formal arrest." *Matheny,* 46 P.3d at 467. Indeed, Marshal Daniels' initial contact with Cowart is decidedly different from the scenario in *Holt* where six police officers entered the suspect's apartment with weapons drawn. *See Holt,* 233 P.3d at 1197 (find-ing that the suspect was in custody due, in part, to the evidence of initial physical force).

We are further persuaded that Cowart was not in custody given that the interview took place in his home and in the presence of his wife. Once inside the house, Marshal Daniels asked Cowart to sit down on a couch. During the entire interview, Cowart's wife was present. More precisely, Cowart sat directly across from his wife and was never isolated from her by Marshal Daniels. *See Minjarez,* 81 P.3d at 353 ("The *Miranda* court was particularly concerned about ... coercive interrogation techniques applied to individuals who are isolated and deprived of contact with friends and family."). More-over, the interview took place in a neutral location of Cowart's choice—his living room. *See People v. Howard,* 92 P.3d 445, 452 (Colo. 2004) (noting that questioning that takes place at neutral locations, such as the defendant's home, is less inherently coercive than questioning in a police-dominated setting).

Cowart's decision to drop his pants during the interview does not factor strongly into our analysis of the totality of the circumstances. One factor courts evaluate in making a custody determination is a defendant's nonverbal response to directions given by an officer during an interrogation. *See Matheny,* 46 P.3d at 465–66. The fact that a defendant drops his pants in response to an officer's directions may reflect, in a general way, the custodial nature of an interrogation. Here, however, Cowart was not directed to drop his pants, or even to show his underwear in some less intrusive manner. Rather, Marshal Daniels merely asked whether he could see Cowart's underwear. Cowart did not verbally respond to this question, choosing instead to immediately drop his pants. A reasonable person in Cowart's position likely would not have responded in this manner to Marshal Daniel's mere question. Accordingly, just as the trial court did not consider Cowart's decision to drop his pants in response to Marshal Daniels' question, it does not factor strongly in our custodial determination.

Finally, the tone and manner of the interview convince us that Cowart was not in custody. Marshal Daniels conducted the interview in a conversational tone and without raising his voice. *See Matheny*, 46 P.3d at 467 (focusing on the fact that the officer's general tone of voice was soft). Even though Marshal Daniels stood within three feet of Cowart, he never physically touched Cowart or threatened him with arrest during the interview. Instead, he asked a mixture of direct and open-ended questions. And, while Marshal Daniels freely admitted that his questions were designed to elicit information establishing guilt, he denied ever accusing Cowart of sexually assaulting S.L. or otherwise attempting to coerce a guilty response from Cowart. The atmosphere and tone of the interview did not therefore "evince any attempts by the police to 'subjugate the individual to the will of his examiner.'" *Matheny*, 46 P.3d at 467 (quoting *Miranda*, 384 U.S. at 457, 86 S.Ct. 1602). As such, the trial court found that all of Cowart's statements were voluntary and not the product of coercion. *See Hankins*, 201 P.3d at 1220.

■■ Two polices officers did stand by the entrance to Cowart's home. From this, the trial court speculated that the officers would not have let Cowart leave his home. Accordingly, the trial court concluded that Cowart was not "free to leave" his home and therefore in custody for the purposes of *Miranda*.[1] It is well-settled, however, that the "unarticulated thoughts or views of the officers and suspects are irrelevant." *Elmarr*, 181 P.3d at 1162; *see also McCarty*, 468 U.S. at 442, 104 S.Ct. 3138 ("[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time"). Contrary to the trial court's reasoning then, it is irrelevant whether the officers would or would not have let Cowart leave his home. Similarly, it is irrelevant whether the officers themselves would or would not have left Cowart's home. There is no evidence that Cowart asked to leave his house or requested that the officers themselves leave. Instead, the officers were merely standing near the door of the house they had been invited to enter. Accordingly, the trial court erred in considering the subjective and unarticulated mindset of Marshal Daniels or the other officers.

■ The trial court further erred when it relied on Cowart's nervous and shaky mindset to make a custody determination. Our caselaw states that trial courts must apply an objective standard to determine whether a defendant was in custody for the purposes of *Miranda*. *See Matheny*, 46 P.3d at 465. We explained that the reasonable person standard is "superior to a subjective test because it is not 'solely dependent either on the self-serving declarations of the police officers or the defendant.'" *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 n. 35, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). Subjective factors—such as the defendant's state of mind—do not bear on the custody inquiry.

Applying an objective standard, we conclude that Cowart was not in custody. A consensual interview that takes place in the defendant's house and in the presence of his wife does not exert the compulsive forces *Miranda* sought to prevent. *See Hankins*, 201 P.3d at 1220; *Matheny*, 46 P.3d at 468. In this case then, a *Miranda* advisement was not necessary prior to the formal arrest of Cowart. Accordingly, we reverse the trial court's suppression of the statements made by Cowart during the pre-arrest interview.

### III.

We also reverse the trial court's order prohibiting the People from calling Marshal

---

1. The trial court incorrectly articulated the *Miranda* standard for custody. In its June 16 Order, the trial court explained that "for the purposes of *Miranda* [Cowart] was not free to leave his home...." The "not free to leave" standard applies to determine whether there has been a seizure under the Fourth Amendment. *See People v. Jackson*, 39 P.3d 1174, 1182 (Colo.2002).

To determine custody for *Miranda* purposes under the Fifth Amendment, "the question is not whether a reasonable person would believe he was not free to leave, but rather whether such a person would believe he was in police custody of the degree associated with a formal arrest." *People v. Polander*, 41 P.3d 698, 705 (Colo.2001).

Daniels as a witness during its case in chief. The trial court ordered that "[b]ecause Marshal Daniels twice violated the Defendant's right to remain silent and speak with counsel ... Daniels may not be called by the People during their case in chief." The trial court did not, however, articulate a clear basis for this broad prohibition.

 Our analysis starts by identifying three potential bases for the trial court's order prohibiting the People from calling Marshal Daniels. First, as the People argue, the prohibition may have been an extension of the trial court's suppression order. In the context of Fourth Amendment violations, courts have relied upon the exclusionary rule to suppress evidence immediately seized as a result of a Fourth Amendment violation, as well as those items of evidence tainted from the constitutional violation. *See Wong Sun v. United States*, 371 U.S. 471, 485–86, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Here, the trial court found that Marshal Daniels failed to adequately warn Cowart of his *Miranda* rights during the pre-arrest interview. Marshal Daniels also violated Cowart's Fifth and Sixth Amendment rights during the subsequent jailhouse interview. Pursuant to Crim. P. 41(g), the trial court suppressed the statements given by Cowart during both of these incidents. The trial court may then have suppressed all of the testimony of Marshal Daniels on the grounds that all the evidence he gathered was subject to the exclusionary rule.

Alternatively, the trial court might have prohibited the People from calling Marshal Daniels due to outrageous governmental conduct. Cowart alleged two instances of outrageous governmental conduct: (a) the questioning of Cowart by Marshal Daniels in violation of his constitutional rights, and (b) the failure of the District Attorney to preserve a DVD recording of witnesses' statements. It is possible that the trial court may have prohibited Marshal Daniels from testifying due to these alleged instances of outrageous governmental conduct.

Finally, as Cowart argues, the prohibition might be a stand-alone sanction for a series of discovery violations by the People. The trial court's order cites, in passing, to Crim. P. 16(III)(g) which sets out sanctions for failure to comply with discovery. From this, Cowart infers that the trial court sanctioned the People for a series of violations by prohibiting them from calling Marshal Daniels.

 Ultimately, none of these three theories can support the trial court's order prohibiting the People from calling Marshal Daniels. First, neither Crim. P. 41(g) nor the exclusionary rule authorizes the trial court to exclude all of Marshal Daniels' testimony from the People's case in chief. Crim. P. 41(g) only grants the trial court authority to suppress a "confession or admission" of a defendant, not the entire testimony of a witness. Similarly, the exclusionary rule does not allow a court to suppress untainted evidence. For example, failure to give a defendant a *Miranda* warning does not require suppression of physical fruits of the suspect's unwarned but voluntary statements. *See United States v. Patane*, 542 U.S. 630, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004). Here, the trial court found that Cowart's pre-arrest testimony was voluntary. Thus, to the extent the trial court relied on the exclusionary rule to prohibit all of Marshal Daniels testimony, its order contravenes *Patane* and constitutes an abuse of discretion.

 Second, there was no outrageous government conduct to justify an order prohibiting Marshal Daniels from testifying. Even though Marshal Daniels twice elicited comments from Cowart in violation of his Fifth and Sixth Amendment rights, the trial court concluded that these Constitutional violations were not "shocking to a universal sense of justice." The trial court therefore dismissed the allegations of outrageous governmental conduct. This ruling necessarily precludes any possibility that the trial court prohibited Marshal Daniels' testimony due to outrageous governmental conduct.

Finally, there were no discovery violations to justify a sanction prohibiting Marshal Daniels from testifying. Crim. P. 16(III)(g)

states that where "a party has failed to comply with this [discovery] rule ... the court may ... prohibit the party from introducing into evidence the material not disclosed...." Here, however, Cowart did not allege any discovery violations by the People. Instead, Cowart alleged violations of his Fifth and Sixth Amendment rights—the type of violations addressed by a Crim P. 41(g) suppression order, not a Crim P. 16(III)(g) discovery sanction. Accordingly, the trial court's prohibition cannot be justified as a discovery sanction. Instead, we are persuaded that, if anything, the trial court's prohibition of Marshal Daniels' testimony was effectively a suppression order under Crim. P. 41(g). As we noted however, we reverse the order prohibiting the People from calling Marshal Daniels on the grounds that such a broad suppression order constitutes an incorrect articulation of the exclusionary rule and, hence, an abuse of discretion.

▅▅▅▅ Nonetheless, Cowart argues that we lack jurisdiction to review the trial court's prohibition in the first place. C.A.R. 4.1(a) only grants this Court jurisdiction to hear appeals from suppression orders pursuant to Crim. P. 41(e) or 41(g); *People v. Lindsey,* 660 P.2d 502, 504–05 (Colo.1983). Each of the grounds enumerated in Crim. P. 41(e) and 41(g) is premised on Fourth, Fifth, Sixth, or Fourteenth Amendment rights. Based on the above analysis, we are persuaded that the prohibition on all of Marshal Daniels' testimony can only be logically viewed as a suppression order for Marshal Daniels' violation of Cowart's Fifth and Sixth Amendment rights. Accordingly, because the prohibition

was an attempted suppression order under Crim. P. 41(g) and the exclusionary rule, we have jurisdiction under C.A.R. 4.1. Moreover, even if the prohibition might have been a discovery sanction or a sanction for outrageous governmental conduct, we would still consider the issue on its merits as an original proceeding pursuant to C.A.R. 21. *See People v. Null,* 233 P.3d 670 (Colo.2010); *People v. Casias,* 59 P.3d 853 (Colo.2002). Despite Cowart's arguments then, we have jurisdiction to review both the suppression of the pre-arrest interview as well as the prohibition on Marshal Daniels' testimony.

## IV. Conclusion

For the foregoing reasons, we reverse the trial court's order suppressing the statements made by Cowart during the pre-arrest interview. We further reverse the trial court's order prohibiting the People from calling Marshal Daniels during its case in chief.

Justice MÁRQUEZ does not participate.