COLORADO COURT OF APPEALS                                          **2016COA88**

Court of Appeals No. 13CA1431
Adams County District Court No. 11CR3119
Honorable Jill-Ellyn Straus, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

April Rose Travis,

Defendant-Appellant.

RULINGS AFFIRMED IN PART AND CASE
REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE BERGER
Kapelke*, J., concurs
Richman, J., concurs in part and dissents in part

Announced June 16, 2016

Cynthia H. Coffman, Attorney General, Molly E. McNab, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Douglas K. Wilson, Colorado State Public Defender, Kamela Maktabi, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2015.

¶ 1     Defendant, April Rose Travis, beat her housemate with a mop handle and stabbed her over a disagreement about money.  A jury convicted Travis of second degree assault causing serious bodily injury, felony menacing, and third degree assault with a deadly weapon.  The trial court sentenced Travis to ten years imprisonment and three years of mandatory parole.

¶ 2     Travis claims three errors on appeal.  First, she argues that the trial court erred when it denied her motion to suppress statements she made to the police and admitted those statements at trial.  Second, she contends that the trial court abused its discretion when it denied her motion to continue the trial so she could hire private counsel.  Third, she argues that statements by the prosecution during closing argument constituted prosecutorial misconduct.  Travis also asserts that the cumulative effect of these alleged errors requires reversal.

¶ 3     Because we are unable to determine on the record before us whether the court should have continued the trial, we remand for further proceedings.  We reject all other claims of error.

## I. Relevant Facts and Procedural History

¶ 4     Travis, her husband, and the victim lived together in a three-bedroom trailer. The victim suffered from disabilities and Travis purportedly helped the victim manage her money and medications.

¶ 5     Travis learned that the victim had between six and eight dollars in her purse. Travis told the victim she was not permitted to have any money (the basis for such a directive is unclear), and took away the victim's purse. The victim demanded that Travis return her purse. In response, Travis slapped the victim and punched her in the face several times. The victim fell and knocked over a potted plant, spilling dirt on the floor. Travis ordered the victim to clean up the mess. When the victim did not do so to Travis's satisfaction, Travis hit the victim with a mop handle repeatedly, tore out clumps of her hair, and stabbed her arm with a kitchen knife. The victim called 911.

¶ 6     Several medical personnel and police officers responded to the call. While the victim received medical attention in the living room, one of the officers asked Travis to step into the adjoining kitchen, where he questioned her for about ten minutes. A second officer participated in a portion of that interview.

¶ 7     After Travis told the first officer that she had attacked the victim, the second officer arrested Travis and drove her to the police station, where she was advised of her *Miranda* rights and further interrogated.  Travis again admitted to the attack during this interrogation.  Travis was charged with second degree assault causing serious bodily injury, felony menacing, and second degree assault with a deadly weapon.

¶ 8     Travis moved to suppress the statements she made to the police at her home and at the police station.  The trial court denied her motion.  On the morning of trial, Travis requested a continuance to enable her to dismiss her public defender and hire private counsel.  The court denied that motion, the trial commenced, and the jury convicted Travis of the offenses described above.

## II. Suppression of Travis's Statements to Police

### A. Custody Determination

¶ 9     Travis argues that the trial court erroneously concluded that she was not in custody during the interview with police that occurred at her home and that, because she was not advised of her *Miranda* rights, the court erred in denying her motion to suppress

the statements she made at that time. Like the trial court, we conclude that Travis was not in custody during that interview and thus no *Miranda* warnings were required.

## 1. Law

¶ 10    "To protect a [defendant's] Fifth Amendment right against self-incrimination, *Miranda* prohibits the prosecution from introducing in its case-in-chief any statement . . . procured by custodial interrogation, unless the police precede their interrogation with [*Miranda*] warnings." *People v. Matheny*, 46 P.3d 453, 462 (Colo. 2002) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). The protections of *Miranda* apply only if a defendant is subject to both custody and interrogation. *Mumford v. People*, 2012 CO 2, ¶ 12.

¶ 11    The People concede that Travis was subjected to interrogation at her home. Thus, to resolve Travis's claim, we must determine whether the trial court correctly ruled that she was not in custody at that time.[1]

---

[1] There is no dispute that Travis was in custody at the police station.

¶ 12　　Determining whether a person is in custody for *Miranda* purposes is a mixed question of fact and law. *Matheny*, 46 P.3d at 462. We defer to the trial court's findings of historical fact if those findings are supported by competent evidence in the record. *Id.* However, we review de novo the legal question of whether the facts, taken together, establish that a defendant was in custody for *Miranda* purposes. *People v. Elmarr*, 181 P.3d 1157, 1161 (Colo. 2008).

¶ 13　　"To determine if a particular defendant was in custody, trial courts must decide whether a reasonable person in the defendant's position would consider himself to be deprived of his freedom of action to the degree associated with a formal arrest." *People v. Pascual*, 111 P.3d 471, 476 (Colo. 2005) (citation omitted). To make this determination, a court must consider the totality of the circumstances under which the interrogation was conducted. *People v. Barraza*, 2013 CO 20, ¶ 17. Factors a court should consider include the following:

> (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and

mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.

*Matheny*, 46 P.3d at 465-66. No single factor is determinative. *People v. Pleshakov*, 2013 CO 18, ¶ 20.

### 2. Application

### a. Facts

¶ 14 The following undisputed facts inform our analysis of the custody issue:

- At about 1:00 a.m., several officers and medical personnel responded to an emergency call at Travis's home.

- One of the officers approached Travis and asked her to step from the living room into the kitchen, a distance of about fifteen feet, so he could ask her some questions.

- No walls separated the kitchen and the living room.

- The officer questioned Travis about the events of that night for about ten minutes.

- Travis's husband was seated five or six feet away from Travis during the interview and was within her line of sight.

- The officer did not place Travis in handcuffs or touch her during the interview.

- The officer asked open-ended questions and maintained a conversational tone.

- Travis's demeanor was calm and relaxed, she was responsive to questions and gave coherent answers, and she did not ask the officers any questions.

- A second officer joined the interview for three or four minutes and then left before the interview had concluded.

- Though both officers were in uniform and armed, neither made any threats or promises or brandished their weapons.

- Immediately after the interview concluded, the first officer took the second officer aside and told him that Travis had admitted to having committed the assault. The second officer then told Travis, "you are going to be placed under arrest for assault against [the victim]," placed her in handcuffs, and drove her to the police station.

## b. Analysis

¶ 15    For five reasons, we conclude that Travis was not in custody for *Miranda* purposes during the interview at her home.

¶ 16    First, neither of the officers used physical restraint or force on Travis during the interview. *See People v. Breidenbach*, 875 P.2d 879, 886 (Colo. 1994) ("One well-recognized circumstance tending to show custody is the degree of physical restraint used by police officers to detain a citizen."). To the contrary, the first officer did not demand, but merely requested, that Travis move to the kitchen. *See People v. Howard*, 92 P.3d 445, 452 (Colo. 2004) (suspect was not in custody where the officer asked, but did not direct, the suspect to step outside of his home).

¶ 17    Second, though Travis was never told that she was "free to leave," she did not appear emotionally distraught, was calm, and never indicated that she wanted the interview to end. *See People v. Klinck*, 259 P.3d 489, 494 (Colo. 2011).

¶ 18    Third, the interview was brief, lasting no more than ten minutes. *See id.* This scenario is significantly different from the circumstances in *People v. Holt*, 233 P.3d 1194, 1195-96 (Colo. 2010), where the supreme court concluded that the defendant was

in custody because at least six police officers entered the defendant's apartment with their weapons drawn, the defendant was handcuffed and ordered not to move, the defendant's voice quavered during questioning, and the interview lasted nearly thirty minutes.

¶ 19 Fourth, though several officers were present in and around Travis's home, only two questioned Travis, and one participated in the conversation for only three or four minutes. Moreover, Travis's husband (who was also unrestrained) was nearby, and the officers' tones were conversational. These circumstances are similar to those in *Pleshakov*, ¶ 30, where the supreme court concluded that the defendant was not in custody when four officers were present during the interrogation with the defendant, but only one officer questioned the suspect while the other officers were engaged in other tasks; the defendant was questioned in close proximity to his two companions, neither of whom was handcuffed; and the tone of the interaction was conversational.

¶ 20 Lastly, although the interview took place late at night during a response to an emergency call, it took place in Travis's kitchen and not in a secluded location. In *People v. Cowart*, 244 P.3d 1199,

1204 (Colo. 2010), the supreme court addressed the significance of an interview taking place in the suspect's home, which is inherently less coercive than questioning in a "police-dominated setting." *Cf. Orozco v. Texas*, 394 U.S. 324, 326-27 (1969) (holding that a neutral locus is not determinative because *Miranda* protections are not limited to police station interrogations). In *Cowart*, four officers went to the defendant's home at night to question him about an alleged sexual assault. 244 P.3d at 1204. One officer asked the defendant to sit down in the living room and then asked him questions while the other officers stood a few feet away. *Id.* During the interview, the defendant's wife was seated nearby, and the defendant was never isolated from her by the officers. *Id.* Taking these circumstances into consideration, the court concluded that "[a] consensual interview that takes place in the defendant's house and in the presence of his wife does not exert the compulsive forces *Miranda* sought to prevent." *Id.* at 1205.

¶ 21    Similarly, Travis was interviewed in her kitchen with her husband in view and the officers did not isolate her. This contrasts with *People v. Minjarez*, 81 P.3d 348, 356-57 (Colo. 2003), where the defendant was determined to be in custody when he was

questioned in a conference room at a hospital with the door closed and officers blocking the exit.

¶ 22    All of these circumstances support the trial court's conclusion that Travis was not in custody when she was questioned at her home.

¶ 23    Nevertheless, Travis argues, relying on *People v. Polander*, 41 P.3d 698 (Colo. 2001), that because it was objectively apparent that police officers had reason to arrest her, she did not feel at liberty to terminate the interrogation and leave, and therefore was in custody.

¶ 24    In *Polander*, officers witnessed the defendant and two others using drugs in the back of a van parked in a restaurant parking lot. *Id.* at 701.  The officers made an investigatory stop and patted down the occupants of the vehicle for weapons.  *Id.*  They found narcotics in the pocket of one of the occupants, handcuffed him, and instructed him to sit on a nearby curb.  *Id.*  The defendant was not yet handcuffed but also was ordered to sit on the curb while the officers searched the van.  *Id.*  The officers then found more narcotics in the van, and asked the defendant whether they belonged to her.  *Id.*  She admitted that they did and the officer

11

arrested her.  *Id.*  The supreme court concluded that, under those circumstances, the defendant was subjected to custodial interrogation because, among other reasons, she "had every reason to believe she would not be briefly detained and then released."  *Id.* at 705.

¶ 25    But, eight years later, the supreme court held in *People v. Hankins*, 201 P.3d 1215, 1219 (Colo. 2009), that a defendant's reasonable belief that she would be arrested is not dispositive to a custody determination; rather, it is just one factor to consider under the totality of the circumstances.

¶ 26    In *Hankins*, the court concluded that even though the defendant confessed to murdering his wife and brought the police officers to the site where he buried her body, "the surrounding factual circumstances [fell] short of demonstrating restraint equivalent to arrest."  *Id.* at 1219.  The court so concluded because, unlike the situation in *Polander*, the police did not seize Hankins when he gave his initial confession, he invited the officers to his home to talk, he voluntarily led the police to the burial site, and he was not the subject of an investigatory stop or any other kind of detention.  *Id.* at 1220.  Accordingly, Hankins's "expectation,

apprehension, or knowledge of inevitable arrest" did not compel a custody determination because "[a] consensual interview that takes place at the defendant's request, on his property and at a place where he offered to drive the investigators does not exert the compulsive forces *Miranda* sought to prevent." *Id.* at 1219-20.

¶ 27 The facts of this case are closer to those in *Hankins* than those in *Polander*. As in *Hankins*, Travis was never frisked and she voluntarily admitted to attacking the victim. Unlike in *Polander*, Travis was never ordered to stand or sit in any location while the officers conducted their police work and none of the other occupants in the trailer home was ordered to sit or stand at any particular place. Though the first interviewing officer asked Travis about the assault, he requested an explanation of the events of that night, and did not accuse her of committing a crime. Indeed, no accusation was made until after the interview had concluded, when the second interviewing officer arrested Travis.

¶ 28 Travis may have reasonably expected that she would be arrested because it was apparent that an assault had taken place, but this factor alone does not outweigh the numerous other factors

supporting a determination that she was not in custody. *Hankins*, 201 P.3d at 1219-20.

¶ 29    Under these circumstances, we agree with the trial court that a reasonable person in Travis's position would not have believed that she was deprived of her freedom of action to the degree associated with a formal arrest. Thus, Travis was not in custody when she gave the statements at her home to the police, and the trial court did not err in denying her motion to suppress the statements she made at her home.

## B. Voluntariness of Statements

¶ 30    Travis also argues that the trial court erred in concluding that the statements she made to the police during interviews at her home and at the police station on the night of the assault were voluntary. She argues that, regardless of whether there was *Miranda* compliance, the trial court erred in denying her motion to suppress. We disagree.

## 1. Law

¶ 31    The state bears the burden of establishing the voluntariness of a defendant's statement by a preponderance of the evidence. *Effland v. People*, 240 P.3d 868, 878 (Colo. 2010). We uphold a trial

court's findings of fact on the voluntariness of a statement if they are "supported by adequate evidence in the record." *Id.* However, the ultimate determination of whether a statement is voluntary is a legal question that we review de novo. *Id.*

¶ 32    The Due Process Clauses of the United States and the Colorado Constitutions forbid the use of a defendant's involuntary statement in a criminal prosecution. *Jackson v. Denno*, 378 U.S. 368, 376 (1964); *Effland*, 240 P.3d at 877. "A confession or inculpatory statement is involuntary if coercive governmental conduct played a significant role in inducing the statement." *Effland*, 240 P.3d at 877. Coercive conduct includes not only physical abuse or threats but also subtle forms of psychological coercion. *Id.*

¶ 33    Conversely, a statement is voluntary if it is "the product of an essentially free and unconstrained choice by its maker." *Id.* (citation omitted).

¶ 34    Whether a statement is voluntary must be evaluated under the totality of the circumstances. *Id.* Factors to consider include the following:

> Whether the defendant was in custody or was free to leave and was aware of his situation; whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived his *Miranda* rights; whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation; whether the challenged statement was made during the course of an interrogation or instead was volunteered; whether any overt or implied threat or promise was directed to the defendant; the method and style employed by the interrogator in questioning the defendant and the length and place of the interrogation; and the defendant's mental and physical condition immediately prior to and during the interrogation, as well as his educational background, employment status, and prior experience with law enforcement and the criminal justice system.

*Id.* at 877-78.

## 2. Application

### a. Interview at Travis's Home

Travis argues that the statements she made to the police at her home were involuntary because (1) she was not given a *Miranda* warning prior to that interview; (2) she was physically isolated from her husband during the interview; and (3) the behavior of the interviewing officers and the presence of other officers in her home during the interview constituted coercive conduct.

16

¶ 36    Though Travis was not given a *Miranda* warning prior to the interview, we have concluded above that none was required. *See California v. Beheler*, 463 U.S. 1121, 1125 (1983) (holding that there is no requirement to give a *Miranda* warning to a person not in custody, even when that person is the subject of interrogation).

¶ 37    The record does not support Travis's claim that she was physically isolated from her husband. As explained in the previous section, Travis's husband was only a few feet away from her, she and her husband could see each other the entire time, and no walls separated Travis from her husband.

¶ 38    Most importantly, there simply is no evidence of any coercive behavior by the police — a condition precedent to a finding of involuntariness. *Effland*, 240 P.3d at 877. The officers' behavior did not "overbear [Travis's] will to resist and bring about confessions not freely self-determined." *Id.* Two officers were present for only a portion of what was a brief interview, and the other officers were attending to other tasks. During the interview, the officers maintained a distance of several feet from Travis, who stood at least three feet away from the nearest wall. The interview was conversational at all times; the officers never made specific

threats or demands, or promised Travis anything in return for her conversation; the interview took place in Travis's home; Travis never asked to stop the interview or to speak with an attorney; and Travis appeared calm and relaxed.

¶ 39 For these reasons, we reject Travis's argument that the statements she made to the officers at her home were involuntary.

### b. Interview at the Police Station

¶ 40 To support her argument that her statements at the police station were involuntary, Travis asserts that she was "stressed." She notes that at one point she started to write her statement, but stopped after a few lines because she did not want to retell her story.

¶ 41 As noted above, "coercive government conduct is a necessary predicate to the finding that a confession is not voluntary." *Id.* (citation omitted). Even if coercive conduct is found, the conduct must have "played a *significant role* in inducing the statements." *People v. Valdez*, 969 P.2d 208, 212 (Colo. 1998).

¶ 42 The record is devoid of any evidence of coercive conduct at the police station, much less coercive conduct that played a significant role in inducing Travis's statements. Therefore, the trial court did

18

not err in denying Travis's motion to suppress her statements made at the police station.

## III. Motion to Continue

¶ 43 Travis argues that the trial court abused its discretion when it denied her request for a continuance to seek new counsel. In *People v. Brown*, 2014 CO 25, a case decided after Travis's trial, the supreme court held that a trial court must consider at least eleven factors when it decides such a motion for continuance. Although the district court considered some of the *Brown* factors, it could not have known at that time that the supreme court would later require express consideration and balancing of many other factors to resolve a motion for a trial continuance for the purposes of hiring new counsel. Because there is insufficient information in the record for us to determine whether the trial court abused its discretion in denying the motion to continue, we must remand the case to the trial court for additional findings.[2]

---

[2] Although *People v. Brown*, 2014 CO 25, does not state whether its holding should be applied to continuance motions decided before *Brown* was announced, based on *Brown*'s disposition (which remanded for the trial court to make additional findings), we conclude that *Brown* is applicable at least to cases directly appealed

## A. Law

¶ 44     A criminal defendant is entitled to representation by counsel of her choice. *Id.* at ¶ 16; *see also* U.S. Const. amend. VI. This right is not absolute, however. Considerations such as judicial efficiency or the public's interest in the integrity of the judicial process may outweigh the defendant's interest in being represented by a particular attorney. *Brown,* ¶ 17. The trial court must apply a multi-factor test to balance these interests. *Id.* at ¶ 24. The *Brown* factors are:

> 1. the defendant's actions surrounding the request and apparent motive for making the request;
>
> 2. the availability of chosen counsel;
>
> 3. the length of continuance necessary to accommodate chosen counsel;
>
> 4. the potential prejudice of a delay to the prosecution beyond mere inconvenience;
>
> 5. the inconvenience to witnesses;
>
> 6. the age of the case, both in the judicial system and from the date of the offense;

---

after *Brown.* Thus, *Brown* is applicable to this case. *See People v. Stidham,* 2014 COA 115, ¶ 17.

7. the number of continuances already granted in the case;

8. the timing of the request to continue;

9. the impact of the continuance on the court's docket;

10. the victim's position, if the victims' rights act applies; and

11. any other case-specific factors necessitating or weighing against further delay.

*Id.* The trial court must make findings on each of the *Brown* factors to enable appellate review of the discretionary decision to grant or deny the continuance. *Id.* at ¶¶ 19, 25; *Stidham,* ¶ 17.

¶ 45 Because the trial court did not have the benefit of *Brown* when it denied the motion to continue, it apparently did not consider or weigh all of the *Brown* factors.

¶ 46 The threshold question here is whether *Brown* always requires an appellate court to remand to the trial court for further proceedings when the trial court did not consider or balance all of the *Brown* factors.

¶ 47 The supreme court did not expressly address this question in *Brown.* However, its explanation for why it remanded that case to the trial court for further factual findings is instructive, and leads

21

us to conclude that, at least under some circumstances, an appellate court may affirm the denial of a trial continuance even when the trial court did not expressly consider and balance all eleven *Brown* factors.

¶ 48     In directing a remand to the trial court, the supreme court in *Brown* stated:

> Although the record contains some of the information for evaluating whether the trial court abused its discretion in denying the continuance, the record lacks information about other factors that the court should have considered when making its decision. Importantly, lacking from the record is any information about how long it would take [the defendant's substitute counsel] to prepare for trial. The trial court did not inquire into how long of a continuance was needed. The record also lacks information about the court's docket and whether the continuance would cause significant inconvenience for the witnesses who had already been subpoenaed several times. The record also does not contain information regarding whether the trial court considered the age of the case when deciding to deny the continuance. Finally, the victim's position regarding a potential continuance is relevant and must be considered. The victim's position regarding this motion to continue is not in the record in this case. Given the lack of information about these other factors, it is necessary for us to remand the matter so that the trial court may make sufficient factual findings.

*Brown,* ¶¶ 28-29.

¶ 49     We read these passages in *Brown* to authorize an appellate
court to affirm a denial of a trial continuance even when the trial
court has not expressly considered and balanced the eleven *Brown*
factors *if, but only if,* the record contains sufficient information
concerning the *Brown* factors such that an appellate court can
meaningfully determine whether the trial court's denial of the
continuance was an abuse of discretion.

## B. Analysis

¶ 50     On the day that trial was set to begin, Travis made the
following request: "My request was that I was going to look for and
pay for an attorney.  I don't feel this case is fair regarding [the
victim].  There's a lot of stuff that needs to come out about her.  I
don't think it's fair to me."

¶ 51     The court responded that because the case had been pending
for a "very long time," Travis had had "plenty of time" to decide if
she wanted to hire private counsel.  The court described Travis's
appointed counsel as experienced, careful, and hard working.  It
then denied her request for a continuance, and informed Travis
that, if she was dissatisfied with her current legal representation,

she could proceed pro se. Travis elected to proceed with her appointed counsel.

¶ 52    The dissent construes Travis's statements to the trial court as indicating that she had done nothing to attempt to hire new counsel, but we are not as sure as the dissent. Not infrequently, defendants incarcerated on a pretrial basis have family members or friends who attempt to retain counsel for the defendant. We cannot tell from this record whether any such activities were underway. Thus, on this record, we cannot sufficiently consider "the availability of chosen counsel" or "the length of a continuance necessary to accommodate chosen counsel."

¶ 53    Similarly, there is nothing in this record that addresses the potential prejudice of a delay to the prosecution beyond mere convenience; the inconvenience to witnesses; the impact of the continuance on the court's docket; or the victim's position, if the victims' rights act applies. Because there is insufficient evidence in the record to determine the missing *Brown* factors, a remand is required.

¶ 54    The dissent accurately distinguishes this case, in which the identity of substitute counsel was not specified by Travis, from

24

*Brown,* in which the defendant had already retained substitute counsel (and substitute counsel actually argued the request for continuance). However, to the extent that the dissent argues that *Brown* is inapplicable to this case because of those distinguishing facts, we cannot agree.

¶ 55     We are aware of no authority holding that a defendant's failure to secure substitute counsel at the time of the motion to continue precludes application of a balancing test weighing the public's interest against the defendant's right to choice of counsel. Instead, every case we have reviewed employing such balancing tests treats the defendant's success or failure in retaining acceptable substitute counsel as a nondispositive factor that the trial court can (and, under *Brown,* must) weigh in deciding the motion. *See, e.g., United States v. Burton,* 584 F.2d 485, 491 (D.C. Cir. 1978) (One of the factors a trial court may consider in deciding a continuance motion is "whether the defendant has other competent counsel prepared to try the case."); *State v. DeWitt,* 289 P.3d 60, 64 (Idaho Ct. App. 2012) ("[I]f a defendant seeks to obtain new private counsel just before trial, the district court must decide if the reasons for the defendant's request . . . justify a continuance."); *People v. Curry,*

25

990 N.E.2d 1269, 1278 (Ill. App. Ct. 2013) (A court does not abuse its discretion in denying a defendant's motion to continue to accommodate substitute counsel where, after an inquiry, the court determines that counsel is not "ready, willing, and able to make an unconditional entry of appearance."); *State v. Kates*, 81 A.3d 662, 664 (N.J. 2014) (following *Burton*); *Vargas v. State*, 322 P.3d 1282, 1286 (Wyo. 2014) (same).

¶ 56 Even if the defendant's failure to hire or even attempt to hire substitute counsel before requesting a continuance served as a bar to a continuance, based on the record before us, we cannot be sure that Travis or her family had not made a sufficient (or any) effort to identify private counsel so as to overcome that bar because the trial court did not inquire whether she had. All we know is that Travis desired a continuance so that she could "look for and pay for an attorney." While Travis's statements might be read, as the dissent evidently reads them, to mean that she had not yet done anything to find new counsel, we cannot conclude with sufficient confidence that that was surely the case.

¶ 57 The dissent also would affirm on the independent ground that any abuse of discretion in denying the trial continuance constituted

constitutionally harmless error. The United States Supreme Court has held that when a request for a continuance for the purpose of obtaining new counsel is improperly denied, the error is structural and is not subject to constitutional harmless error review. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006).

¶ 58 The parties have not briefed the question of whether the allegedly improper denial of Travis's request for a continuance in this case requires the application of constitutional harmless error review or automatic reversal under the structural error doctrine. In the absence of such briefing we, like the supreme court in *Brown,* consider it prudent not to decide the question.

¶ 59 We nevertheless reject the dissent's suggestion that we may affirm because any error in the trial court's denial of the continuance motion was harmless beyond a reasonable doubt. While we do not hold that the *Brown* error here was structural, the reasons that supported the Supreme Court's determination that structural error applies to at least some improperly denied motions for trial continuances informs our determination that the error here was not harmless beyond a reasonable doubt.

¶ 60    As the Supreme Court has recognized, the strategies and abilities of counsel vary tremendously. *Id.* Applying the strict definition of constitutional harmless error, we cannot conclude, as does the dissent, that even the existence of a confession makes any error in depriving Travis of her choice of counsel constitutionally harmless. While the confession may have rendered some conviction very likely in this case, regardless of who represented Travis at trial, that conclusion does not exclude the reasonable possibility that a jury would convict on some but not all of the charged offenses or convict on a lesser included offense but acquit of the greater offense. In our view, though we recognize the force of the dissent's argument, we cannot conclude that any error was harmless beyond a reasonable doubt.

¶ 61    Because there is insufficient information in the record to determine if the court acted within its discretion or abused it and violated Travis's Sixth Amendment right to counsel of her choice by denying the continuance, we remand the case for the trial court to make written findings and enter an order either upholding its denial of the continuance, or, if the court determines that *Brown* required

it to grant the motion for continuance, granting a new trial. In doing so, the court may consider additional evidence.

## IV. Prosecutorial Misconduct

¶ 62    Travis argues the prosecutor's closing argument was improper because the prosecutor (1) singled out lesser included offense instructions requested by Travis and (2) told the jury that Travis's counsel believed Travis was guilty.

¶ 63    "Whether a prosecutor's statements constitute misconduct is generally a matter left to the trial court's discretion." *Domingo-Gomez v. People*, 125 P.3d 1043, 1049 (Colo. 2005). Reviewing a claim of prosecutorial misconduct requires a two-step analysis. *People v. McMinn*, 2013 COA 94, ¶ 59. First, we must determine whether the prosecutor's challenged conduct was improper based on the totality of the circumstances. *Id.* Only if we conclude that the conduct was improper do we then consider whether it warrants reversal according to the proper standard of review. *Id.*

¶ 64    During voir dire, Travis's counsel told the jury panel, "What I've kind of been getting at is that the law recognizes there's lesser offenses. It's pretty rare that you have a defense attorney stand up

here and say I'm going to tell you right now that my client is guilty of some things, right?" Travis's counsel went on to ask a potential juror whether she understood that there are varying degrees of assault. Defense counsel also told the jury during its opening statement that Travis was "overcharge[d]."

¶ 65 In addition to instructions for the charged crimes, the jury was instructed on the lesser included offenses of third degree assault — criminal negligence and third degree assault — knowingly or recklessly.

¶ 66 During closing argument, the prosecutor argued, in part:

> Defense counsel stood up in their opening and during jury selection and they told you my client is guilty. We just don't think she committed the crime that the prosecution has charged her with committing. That's why you have so many options in this paperwork. You have the crime that we've charged and the crime that the People are attempting to prove. You have the crime that my office has charged and then you have a lesser crime, the crime that is encompassed in the higher charge that my office has filed. I suspect that when defense counsel comes up and when they talk to you during their closing argument, they're going to ask you to come back with not guilty on anything. Knowing and having admitted that their client has committed a crime, they're going to ask you to come back on those lesser offenses, the more minimal charges, charges,

they say their client was likely guilty of on that night.

¶ 67 Relying on *People v. Coria*, 937 P.2d 386 (Colo. 1997), Travis contends that these statements by the prosecutor essentially created two classes of jury instructions — one class from the court and the other from the defendant. From this purported inference, Travis argues that she was deprived of a fair trial.

¶ 68 We first observe that *Coria* is factually inapposite. There, the county court directed the jurors to mark the instruction containing the defendant's theory of the case with the words "defendant's theory of the case." *Id.* at 392. On appeal, the district court reversed the conviction on several grounds, concluding, as relevant here, that the court's direction to the jury deprived the defendant of a fair trial. *Id.*

¶ 69 The supreme court reversed and reinstated the conviction, holding that while the county court should not have spontaneously directed the jurors to mark the instruction, the county court did not comment either on the evidence or on the merits of the case or the instruction and did not deprive the defendant of a fair trial. *Id.*

31

¶ 70    Even if *Coria* were on point, we reject Travis's arguments.  We do not read the prosecutor's remarks here as purporting to create two classes of instructions.  Instead, the prosecutor responded appropriately to the statements previously made to the jury panel and jury by defense counsel asserting that the prosecutor had "overcharged" Travis.  Moreover, it is not misconduct for a prosecutor to tell the jury that a theory of defense instruction is not a statement of law and that the jury need not accept the defendant's theory.  *McMinn*, ¶ 63.

¶ 71    For similar reasons, we reject Travis's argument that the prosecutor denigrated defense counsel by implying that counsel did not have a good faith belief in Travis's innocence.  The prosecutor's remarks were a fair comment on the defense's jury argument that while Travis was guilty of a crime, she was not guilty of the principal charges filed against her.

## V. Cumulative Error

¶ 72    Finally, Travis asserts that the cumulative effect of the errors she alleges denied her a fair trial.  Because we conclude that there were no errors, there could not have been cumulative error.  *People v. Gordon*, 32 P.3d 575, 581 (Colo. App. 2001).

32

## VI. Conclusion

¶ 73    Other than the trial court's ruling on the motion for continuance, we affirm the trial court's rulings challenged by Travis.  We remand the case for the trial court to make the written findings and conclusions mandated by *Brown* and enter an order either upholding its denial of the continuance, or, if the court determines that *Brown* required it to grant the motion for continuance, granting a new trial.  In doing so, the court may consider additional evidence.

¶ 74    After the trial court issues its order on remand, the clerk of the trial court must submit a copy of the order to this court and the appeal will be recertified.  If the trial court determines that a continuance was not required, the judgment of conviction will be affirmed, subject to Travis's right to appeal the court's order on remand.  If the court determines that a continuance should have been granted, the judgment will be reversed and the case will be remanded for a new trial, subject to the appellate rights of any party regarding the court's order on remand.

JUDGE KAPELKE concurs.

JUDGE RICHMAN concurs in part and dissents in part.

33

JUDGE RICHMAN, concurring in part and dissenting in part.

¶ 75 I agree with the majority that suppression of the statements made by Travis to the police at her residence and at the police station is not required and that the prosecution did not commit misconduct in the closing argument at trial. I therefore join in those portions of the opinion.

¶ 76 I disagree that a remand to the trial court to make further findings regarding the denial of the motion to continue the trial is necessary on the facts of this case and therefore dissent from that portion of the opinion.

¶ 77 As the majority correctly observes, the denial of the motion to continue the trial occurred prior to the decision in *People v. Brown*, 2014 CO 25, and in denying the motion, the court did not make explicit findings on, or conduct an express balancing of, all eleven factors listed in *Brown*. The majority acknowledges that under some circumstances, an appellate court may affirm the denial of a trial continuance even when the trial court did not expressly consider and balance all eleven *Brown* factors, but concludes this is not that case. I disagree. In my view, a remand for further findings in this case is not required, even under application of *Brown*.

¶ 78    First, this case is factually and procedurally distinguishable from *Brown*, because there the defendant had already retained private counsel and private counsel had entered an appearance by the time defendant sought a continuance. In fact, it was the private counsel who filed the motion requesting the continuance and stated the grounds for the request. In addition, when the motion was considered by the court, the private counsel was present before the court and was available to answer questions, such as how long it would take counsel to prepare for trial, even though the trial court did not ask. *See id.* at ¶¶ 8-9.

¶ 79    By contrast, in this case, Travis had not hired private counsel; she did not identify, and apparently did not even contemplate, who the private counsel might be. Accordingly, she had not spoken to the private counsel and did not know if counsel would take the case. In fact, all she said was that she was "going to look for and pay for an attorney."

¶ 80    Second, although the trial court did not make findings or a record on each of the eleven factors listed in *Brown*, it did consider, as the majority acknowledges, some of the *Brown* factors.

¶ 81     It did consider the age of the case and the timing of the motion to continue. The motion to continue was filed on the morning of the first day of trial. In denying the motion, the court stated that the case "ha[d] been pending for a very long time" and Travis had "had plenty of time to decide if [she wanted] to hire" private counsel.

¶ 82     The court had also considered what can be viewed as "case-specific factors," *id.* at ¶ 24, in denying a related motion to continue filed just five days earlier. That prior motion sought a continuance to obtain the presence of a witness to testify about the victim. When denying that motion, the trial court noted that securing the presence of the witness had not been accomplished, despite a continuance of several months. The court also expressed doubt regarding the importance of the possible testimony of the witness, noting that she was not an eyewitness. When Travis again moved for a continuance on the morning of trial, she explained that she wanted to hire private counsel because "[t]here's a lot of stuff that needs to come out about [the victim]." Thus, her stated reason for seeking a continuance was related to the prior motion to continue, and the case-specific factors that the court considered in denying

36

that prior motion also applied to its denial of her motion on the morning of trial.

¶ 83    In addition, although the trial court did not make an explicit finding, the prosecution had previously advised the court that the victim was under emotional stress as a result of the pending case, and "expressed great interest" in having the case go forward.

¶ 84    Of course, the trial court did not make findings on the "availability of chosen counsel" or "the length of continuance necessary to accommodate chosen counsel" because no counsel had been chosen.  *Id.* at ¶ 24.

¶ 85    I recognize that the majority in the *Brown* opinion concluded that "when deciding whether to grant a continuance to allow a defendant to change counsel, the trial court must conduct a multi-factor balancing test and determine whether the public's interest in the efficiency and integrity of the judicial system outweighs the defendant's Sixth Amendment right to counsel of choice."  *Id.* at ¶ 30.  But earlier in the opinion, after listing the eleven factors, *Brown* also states: "no single factor is dispositive and the weight accorded to each factor will vary depending on the specific facts at issue in the case."  *Id.* at ¶ 24.

¶ 86    Taken together, I read these holdings as directing consideration of the applicable and relevant factors.  But that does not require a rote recitation by the trial court of all eleven factors, nor does it mandate an automatic remand by an appellate court if some of the factors are not discussed by the trial court.  Moreover, some of the factors listed in *Brown* could not possibly have been weighed by the court because no new counsel had been identified, and it is impractical to make findings on remand as to other factors identified in *Brown,* as Justice Márquez astutely pointed out in her dissent to *Brown.  See id.* at ¶¶ 48-49 (Márquez, J., dissenting).

¶ 87    On the record before us in this case, I conclude that the trial court denied the continuance because it essentially found that the public's interest in the efficiency and integrity of the system outweighed Travis's indefinite request that she wished "to look for and pay an attorney."  That is all *Brown* requires.

¶ 88    Third, I note that in setting forth the standards to be applied by an appellate court reviewing the denial of a motion to continue, *Brown* states that "[o]n appeal, we do not disturb a trial court's denial or grant of a motion for a continuance in the absence of an abuse of discretion" and "[w]e . . . find error only if the [trial] court's

decision was arbitrary or unreasonable and materially prejudiced the defendant." *Id.* at ¶ 19 (citation omitted). I would conclude in this case that there was no material prejudice to Travis, even if her choice of counsel was not recognized.

¶ 89    As the majority correctly holds, Travis provided two admissible confessions of the assault to the police: one in her home almost immediately after the attack, and a second shortly afterwards at the police station. The statements were frank admissions that Travis committed an assault on the victim. Given the fact that both confessions were admitted at trial, I believe that having her choice of different counsel would have made no difference in the outcome of this case, and thus, any error by the trial court was harmless beyond a reasonable doubt.

¶ 90    I recognize that in *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006), the Supreme Court held that when a defendant's choice of counsel is denied, structural error applies. *Gonzalez-Lopez* states that "[w]here the right to be assisted by counsel of one's choice is wrongly denied, . . . it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation." *Id.* at 148. The majority states that it need

not address whether the constitutional harmless error test is applicable here. I conclude that it can be applied.

¶ 91 In this case, Travis was not denied the right to a specific counsel of her choice; she never named or said she had a specific counsel as was true in *Gonzalez-Lopez*. *See id.* at 142-43. Accepting that *Gonzalez-Lopez* establishes a standard of structural error on the facts of that case, those facts are simply not present here. Moreover, our supreme court in *Brown* was well aware of *Gonzalez-Lopez* when it stated that a showing of material prejudice to the defendant was required to find an abuse of discretion in denying a motion to continue, for the *Gonzalez-Lopez* opinion is cited in the next paragraph of *Brown*. *Brown*, ¶¶ 19-20. And, *Brown* states that "[b]ecause we do not decide whether there was an impermissible violation of Brown's Sixth Amendment right to counsel, we do not address whether such a denial constitutes a structural error, thus requiring reversal of the convictions." *Id.* at ¶ 29 n.6.

¶ 92 Thus, I conclude that a structural error analysis does not apply to the denial of a continuance in this case, and given the

language in *Brown* regarding a showing of material prejudice, I believe the constitutional harmless error test may be applied here.