**The PEOPLE of the State of Colorado, Plaintiff–Appellant,**

v.

**Marc HUFNAGEL, Defendant–Appellee.**

**No. 87SA120.**

Supreme Court of Colorado, En Banc.

Nov. 9, 1987.

Reid C. Pixler, Dist. Atty., Michael M. Dutcher, Deputy Dist. Atty., Telluride, for plaintiff-appellant.

David F. Vela, Colo. State Public Defender, Anthony Theodore, Deputy State Public Defender, Montrose, for defendant-appellee.

MULLARKEY, Justice.

Pursuant to C.A.R. 4.1, the People challenge the trial court's order granting the defendant Marc Hufnagel's motions to suppress evidence obtained in two searches of his condominium. We reverse the suppression order and remand for further proceedings.

## I.

On October 21, 1986, Hufnagel was indicted by the grand jury on charges of selling cocaine and a warrant for his arrest was issued. In the afternoon of the same day, Sheriff Masters, Undersheriff Walters, and Sergeant Berg went to Hufnagel's condominium for the purpose of executing the arrest warrant. The officers did not have a search warrant. When the officers arrived at the defendant's condominium, the door to his unit was open and Undersheriff Walters called out the defendant's name. The defendant, who had been asleep on a sofa in the living area downstairs, responded by calling out "Hello" or "Yo." The officers entered the unit at the top of the stairs leading down to the living area. They saw an eighteen-inch billy club in the entry way and a hatchet downstairs near a fireplace. The officers went downstairs, asked Hufnagel to stand up, and told him that he was under arrest for selling cocaine. He did not overtly resist the arrest, but he was slow to follow their instructions. The officers were in plain clothes and, although armed, did not display their weapons.

Within approximately five minutes after the officers first made verbal contact with the defendant, he was arrested, handcuffed, and led out of the condominium unit. The exact sequence of events within the five minutes is not entirely clear from the record or from the trial court's findings. It is apparent that Hufnagel was patted down for weapons shortly after he stood up and, at that time, he was standing near the sofa and an adjacent, octagonal end table about eighteen inches high. One or two of the officers turned Hufnagel around and handcuffed him with his hands behind his back while Sheriff Masters felt around the edge of the sofa for weapons. As the defendant was being handcuffed, Sheriff Masters saw him look at the end table. Concerned by the defendant's glance, the sheriff flipped open a door in the end table and, inside, he saw a white box. Since the box had no lid, he saw that it contained several baggies, each of which held a white substance which he believed was cocaine. He picked up the box and examined its contents without removing

them. He then put the box back into the end table and closed the door.

At approximately the same time that Sheriff Masters searched the sofa and end table, Sergeant Berg made a cursory search of the rest of the condominium to make sure no one else was present. Two of the officers then took the defendant to the sheriff's office; the third remained behind to guard the premises. Later on the same day, Sheriff Masters executed an affidavit for a search warrant, based in part on his observation of the cocaine in the defendant's end table. The warrant was executed, and additional evidence [1] was found and seized.

## II.

■ The defendant moved to suppress the evidence found during the warrantless search incident to his arrest. He conceded that the arrest had been valid, but argued that because he could not have reached into the end table, the search had not been limited to the area within his immediate control. After a hearing, the trial court found as matters of fact that the defendant had been handcuffed before Sheriff Masters searched the sofa and end table and that the door to the end table had been completely closed prior to the search. Based on his finding that the defendant was handcuffed with his hands behind his back, the judge reasoned that the defendant would not have been able to reach into the end table to remove a weapon or to destroy evidence. Therefore, he concluded that the search violated the fourth amendment's prohibition on unreasonable searches and granted the defendant's first motion to suppress.

The defendant also moved to suppress the evidence found during the subsequent search conducted pursuant to the search warrant. The trial court determined that, without Sheriff Masters' observations, the affidavit supporting the search warrant did not state probable cause to authorize the search. Accordingly, it also granted the second motion to suppress.

The People appeal from the order granting both motions to suppress and contend that the following findings of fact made by the trial court are clearly erroneous: (1) that Sheriff Masters offered no specific facts to support his belief that the defendant had been under the influence of drugs at the time of his arrest, (2) that the defendant had been handcuffed before Sheriff Masters searched the end table, and (3) that the end table door had been completely closed when Sheriff Masters first observed it. In addition, the People argue that even if the trial court's findings of fact are supported by the evidence, its conclusions of law are incorrect. Specifically, the People suggest that the fact that the defendant was handcuffed should not have been dispositive, but should have been only one factor considered by the trial court in determining whether the search was reasonable. The defendant's position is that the trial court's findings of fact are supported by the evidence, and that the People have failed to meet the burden of showing that the warrantless search was reasonable.

## III.

We turn first to the People's contention that three of the trial court's findings of fact are clearly erroneous. We will not overturn the trial court's findings of fact if there is adequate support for them in the record; however, if the findings of fact are clearly erroneous and lack support in the record, we must set them aside. *See, e.g., People v. Freeman,* 668 P.2d 1371, 1378 (Colo.1983); *People v. Johnson,* 653 P.2d 737, 740 (Colo.1982).

The trial court's statement that Sheriff Masters did not describe any specific facts supporting his belief that the defendant was under the influence of drugs is supported by the record. As part of his explanation of why the situation was not secure when he made the search, the sheriff stated that the defendant appeared to be intoxi-

---

**1.** Twenty-four items, including the white box that had been inside the end table, $2,028 in cash, a cocaine grinder with a white powdery residue, and a bottle of "cut," were seized during this second search.

cated or under the influence of drugs. He supported his conclusion only by stating that the defendant stumbled around and mentioned Valium. The defendant testified that he was somewhat disoriented when he was arrested because he had been asleep when the officers entered. He also disputed the reference to Valium and stated that he had referred to Enduron, a drug he took for a heart condition. The sheriff was not asked to give a detailed explanation of his observation of the defendant's condition and he did not do so.

Regarding the handcuffing, the evidence in the record indicates that Undersheriff Walters, perhaps with the assistance of Sergeant Berg, was handcuffing the defendant when Sheriff Masters searched the end table. The trial court found that the sheriff's attention was attracted to the end table because the defendant "eyed" it. The court found that the defendant looked at the end table "[a]s the arrest was being completed" but that the sheriff opened the end table door after the defendant was handcuffed. The defendant's testimony can be read to support an inference that he was handcuffed before the sheriff searched the end table and, therefore, we will not disturb the trial court's finding. As will be discussed below, however, unlike the trial court, we do not find this fact dispositive.

The evidence as to whether the end table door was open, slightly ajar, or completely closed prior to Sheriff Masters' search is conflicting. The defendant testified that he did not remember the door being ajar before the officers turned him around and handcuffed him. This testimony supports the trial court's finding that the door was completely closed before Sheriff Masters' search.

Because there is some evidence in the record to support each of the challenged findings, we will not overturn them. We now turn to the legal question raised by the People's appeal.

## IV.

As the defendant notes, a warrantless search is generally presumed to be unreasonable and in violation of the fourth amendment. *See, e.g., People v. Jansen,* 713 P.2d 907, 911 (Colo.1986). The prosecution has the burden of showing that such a search falls within an exception to the warrant requirement. *Id.* In this case, the People rely on the well-settled rule that, when making a lawful arrest, law enforcement officers may search the arrestee's person and the area within the arrestee's immediate control. *See Chimel v. California,* 395 U.S. 752, 762–64, 89 S.Ct. 2034, 2039–41, 23 L.Ed.2d 685 (1969). In *Chimel,* the Supreme Court explained that:

> [I]t is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control" —construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

*Chimel,* 395 U.S. at 763, 89 S.Ct. at 2040.

The trial court found that the end table door was within "lunging" distance of the defendant and its finding is supported by the record. The end table was directly adjacent to the sofa on which the defendant had been sleeping. When he sat up, he was approximately one to two feet from the end table. He stood up when the officers came downstairs, but did not leave "a very narrow confinement of [the] vicinity" of the end table, according to Sheriff Masters' testimony, and moved only "a few feet," according to his own testimony. This evidence indicates that, prior to being handcuffed, the defendant could have reached the end table and grabbed a weapon or destructible evidence from inside it.

In spite of this, the trial court found that the search was unreasonable because the

defendant was handcuffed. We disagree. The search was reasonable in scope and time and was confined to items within the defendant's immediate control. First, it is clear that the police did not engage in a general search of the defendant's home. The search was limited to two items, the sofa and the adjacent end table, which were brought to the officers' attention by the defendant's conduct. As discussed above, Hufnagel had been sleeping on the sofa when the police arrived and he stared at the end table while he was being arrested. Second, the events occurred within a very short time span; the officers spent a total of only about five minutes in the condominium unit. The defendant was not secured when he looked at the end table but he was secured by the time Sheriff Masters flipped open the door. As these findings demonstrate, whether the handcuffs clicked shut before or after the end table search is a matter of split-second timing. We think it would be unwise and highly artificial to make the validity of a search incident to an arrest turn on such a fine point of timing.[2]

Third, the sofa and end table were within the defendant's immediate control. It is well established that, when a search of the arrestee and the area immediately around him or her is incident to a valid, custodial arrest, no additional justification is required for the search. The United States Supreme Court has stated that "[t]he potential dangers lurking in all custodial arrests make warrantless searches of items within the 'immediate control' area reasonable without requiring the arresting officer to calculate the probability that weapons or destructible evidence may be involved." *United States v. Chadwick*, 433 U.S. 1, 14–15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977); *see also United States v. Robinson*,

414 U.S. 218, 234–35, 94 S.Ct. 467, 476–77, 38 L.Ed.2d 427 (1973). This court also has stated that such a search requires no independent justification. *People v. Bischofberger*, 724 P.2d 660, 665 (Colo.1986); *People v. Tottenhoff*, 691 P.2d 340, 345 (Colo. 1984). Therefore, we have declined to make a separate determination in each case as to whether the arresting officers had reason to believe that the arrestee would grab a weapon or evidence from the surrounding area. As explained below, the danger inherent in any custodial arrest also leads us to hold that a search incident to arrest is constitutional even if the arrestee is handcuffed prior to the search.

*Chimel* did not decide the exact boundaries of the search incident to arrest exception to the warrant requirement. Therefore, courts have interpreted the exception in a variety of ways. Many courts have considered the fact that the arrestee was handcuffed as one factor in determining the reasonableness of the search. *See, e.g., United States v. Lyons*, 706 F.2d 321, 330–31 (D.C.Cir.1983) (also considering number of officers present, whether they were armed, distance between arrestee and area searched, and whether arrestee had attempted to reach area searched); *State v. Cox*, 294 Minn. 252, 200 N.W.2d 305, 308–09 (1972) (other factors included number of arresting officers, number of arrestees, and nature and size of evidence). To determine the legal effect of handcuffing an arrestee, courts using this approach have considered the practical effects handcuffs have on the arrestee's "lunging" distance. For example, handcuffs do not completely eliminate an arrestee's ability to reach and grab items. *See United States v. Mason*, 523 F.2d 1122, 1126 (D.C.Cir.1975) (arrestee, handcuffed with hands in front of him,

**2.** This position has been persuasively explained by Professor LaFave:

My basic premise is that Fourth Amendment doctrine, given force and effect by the exclusionary rule, is primarily intended to regulate the police in their day-to-day activities and thus ought to be expressed in terms that are readily applicable by the police in the context of the law enforcement activities in which they are necessarily engaged. A highly sophisticated set of rules, qualified by all sorts

of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions, may be the sort of heady stuff upon which the facile minds of lawyers and judges eagerly feed, but [such rules] may be "literally impossible of application by the officer in the field."

LaFave, *"Case-by-Case Adjudication" Versus "Standardized Procedures": The Robinson Dilemma,* 1974 Sup.Ct.Rev. 127, 141 (1974) (footnotes omitted).

could easily have reached suitcase three to four feet away); *Foster v. State*, 297 Md. 191, 464 A.2d 986, 1001 (1983) (fact that arrestee was handcuffed with hands behind back did not eliminate possibility she could have reached into drawer two feet away), *cert. denied*, 464 U.S. 1073, 104 S.Ct. 985, 79 L.Ed.2d 221 (1984). Further, since handcuffs can fail, it is reasonable for the arresting officer to search the area the arrestee could reach after breaking free from them. *See Foster*, 464 A.2d at 1001.

Other courts have adopted a rule that a search of the area immediately around the arrestee, made contemporaneously with or immediately following the arrest, is constitutional even if the arrestee is physically unable to reach the area searched at the time of the search. *See, e.g., State v. Shane*, 255 N.W.2d 324, 328 (Iowa 1977) (impractical to require officer to expose himself "to the very dangers he is supposed to guard against" in order to perform a valid search incident to arrest); *People v. Fitzpatrick*, 32 N.Y.2d 499, 346 N.Y.S.2d 793, 798–800, 300 N.E.2d 139, 143 (not clear *Chimel* conditioned on arrestee's continued ability to grab), *cert. denied*, 414 U.S. 1033 and 1050, 94 S.Ct. 462 and 554, 38 L.Ed.2d 324 and 338 (1973); *State v. Cherry*, 298 N.C. 86, 257 S.E.2d 551, 558 (1979) ("the defendant in custody need not be physically able to move about in order to justify" search incident to arrest), *cert. denied*, 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980).

We believe the second approach, permitting officers to make a reasonable search incident to arrest regardless of whether the arrestee is handcuffed, is the most realistic approach and serves the purposes behind *Chimel*. Arrests are necessarily tense, risky events when many things are happening at once. The difficulty of imposing an orderly chronology after the fact is apparent in this case. Police officers, who must act quickly, cannot reasonably be expected to pay attention to the exact time at which the arrestee is handcuffed and then to make an accurate guess as to how much a reviewing court will think the handcuffs restrict that particular arrestee's "lunging" distance under all the circumstances.

In an analogous situation, the United States Supreme Court explained that a "police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick *ad hoc* judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search." *Robinson*, 414 U.S. at 235, 94 S.Ct. at 477. The same is true of a search of the area surrounding the arrestee. A case-by-case analysis considering all the circumstances of such a search would be impracticable.

Further, a case-by-case analysis is not required by *Chimel*. In *Chimel*, the United States Supreme Court rejected the prosecution's argument that an unlimited, warrantless search of an arrestee's house was justified whenever an individual was arrested at home, explaining that "[u]nder such an unconfined analysis, Fourth Amendment protection in this area would approach the evaporation point." 395 U.S. at 765, 89 S.Ct. at 2041. Instead, the Court concluded that, while legitimate needs of arresting officers to protect themselves and to preserve evidence made warrantless searches "of the person arrested and the area within his reach" reasonable, those needs did not justify "more extensive searches." 395 U.S. at 766, 89 S.Ct. at 2042. The Court's goal was to develop a rule that would allow police officers to protect themselves and to preserve evidence without eviscerating arrestees' fourth amendment rights. This goal can be met by limiting searches incident to arrests to the area immediately around the arrestee and the time contemporaneous with or immediately following the arrest.

■ Therefore, we hold that the People need not show that the arrestee was physically able to reach the exact place searched at the exact second it was searched in order to justify a search incident to arrest. Instead, the prosecution can meet its burden of showing that a warrantless search was reasonable by showing, as it did here, that it was contemporaneous with or immediately following the defendant's arrest

and was limited to the area immediately around him.

## V.

Because we conclude that Sheriff Masters' observation of the contents of the end table was made during a valid search incident to a lawful arrest, we reverse the trial court's order suppressing the evidence found in both searches. We remand the matter to the trial court for further proceedings consistent with this opinion.