The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
September 1, 2022

## 2022COA99

## No. 19CA2267, *People v. Eugene* — Constitutional Law — Fifth Amendment; Criminal Law — Custodial Interrogation — Miranda

A division of the court of appeals considers whether the trial
court violated the defendant's Fifth Amendment rights by admitting
his statements made during an interrogation that were not
preceded by a *Miranda* warning.  The majority concludes that the
defendant was in custody for the last part of the interrogation based
on the totality of the circumstances.  Because admitting these
custodial statements violated the defendant's Fifth Amendment
rights and were not harmless beyond a reasonable doubt, the
majority reverses.

The dissent disagrees, concluding the defendant was never in
custody during the interrogation.  The dissent therefore concludes

that the trial court properly admitted the defendant's statements made during the interrogation and would affirm.

COLORADO COURT OF APPEALS         **2022COA99**

Court of Appeals No. 19CA2267
Arapahoe County District Court No. 18CR1224
Honorable Ben L. Leutwyler, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Terrence Kenneth Eugene,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE PAWAR
Kuhn, J., concurs
Bernard*, J., dissents

Announced September 1, 2022

Philip J. Weiser, Attorney General, Wendy J. Ritz, First Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Katherine C. Steefel, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2021.

¶ 1     Defendant, Terrence Kenneth Eugene, appeals the judgment of conviction entered on jury verdicts finding him guilty of second and third degree assault arising out of a road rage incident.  We reverse his convictions and remand for retrial because we conclude that admitting a portion of his interrogation by police violated his Fifth Amendment rights.

## I.  Background

¶ 2     The undisputed facts at trial established that Eugene was driving with his wife and got into a road rage incident with two men in another vehicle.  Eventually, all four individuals got out of their vehicles and Eugene had a physical altercation with the other driver.  There was conflicting evidence about who initiated the fight.  Both men sustained injuries, though the other driver's injuries were more severe, including cuts to his face and back.  When the fight ended, Eugene and his wife got back into their car and left.  The two men from the other vehicle remained, called 911, and relayed Eugene's license plate number to the authorities.

¶ 3     Two days later, two police officers arrived at Eugene's apartment and knocked on the door.  They asked Eugene if he would step outside and talk to them, and Eugene agreed.  What

followed was a twenty-seven-minute interrogation that was captured on the body-worn camera of Officer Christopher Thivierge, the interrogating officer. The officers never advised Eugene of his Fifth Amendment rights in accordance with *Miranda v. Arizona*, 384 U.S. 436 (1966). During the interrogation, Officer Thivierge separated Eugene and his wife to interrogate each alone, suggested falsely that he had camera footage of the fight, and denied Eugene's request to go back inside and use the bathroom.

¶ 4        Before trial, Eugene moved to suppress the video of the interrogation, arguing that he was in custody for purposes of *Miranda* and the lack of a *Miranda* advisement rendered his statements during the interrogation inadmissible. The trial court held a suppression hearing and ruled that Eugene was never in custody for *Miranda* purposes. The entirety of Eugene's interaction with the interrogating officer was subsequently admitted at trial (save Eugene's references to being on probation, which were redacted and are irrelevant to this appeal).

¶ 5        The jury found Eugene guilty of second degree assault (reckless) and third degree assault (knowing). The trial court sentenced him to eight years in prison.

¶ 6     On appeal, Eugene argues that the trial court erred by failing to suppress the statements he made during the interrogation.  He also argues that the court erred by refusing to give several self-defense instructions, allowing the prosecutor to engage in improper argument, admitting a medical expert's testimony, and failing to merge his convictions.  We agree with Eugene that the trial court erred by failing to suppress some of his statements from the interrogation.  We further conclude that this error requires reversal and therefore need not address his remaining arguments.

## II.  The Trial Court Should Have Suppressed Some of Eugene's Statements from the Interrogation

¶ 7     Whether an interrogation was custodial, thus requiring a preceding *Miranda* advisement, presents a mixed question of fact and law.  *See People v. Sampson*, 2017 CO 100, ¶ 16.  We defer to the trial court's factual findings if they are supported by the record.  *Id.*  But we review the court's custody determination de novo.  *Id.*

¶ 8     At the suppression hearing, the only evidence was Officer Thivierge's body-worn camera footage and brief testimony from the second officer, which aligned with the footage.  The trial court ruled that Eugene was not in custody and denied the motion to suppress.

3

In so doing, the court found that the officers maintained a distance of four to five feet from Eugene, Eugene had a cigarette during the conversation, no weapons were drawn, and although Officer Thivierge used "assertive mannerisms or language," there was no detectable yelling, threatening, or coercion.

¶ 9    At the hearing, there was no conflicting evidence, nor was the trial court required to make any credibility determinations. We therefore base our analysis on our own review of the body-worn camera footage, mindful that we are in just as good a position as the trial court to determine whether, based on that footage, Eugene was in custody. *See id.* (reviewing court may consider undisputed facts evident in the record).

A. Governing Law on Custody for *Miranda* Purposes

¶ 10    Before being subjected to custodial interrogation by law enforcement, a suspect must be advised of his Fifth Amendment rights, including the right to remain silent to avoid self-incrimination. *Miranda*, 384 U.S. at 444. A suspect's statements during custodial interrogation that were not preceded by a *Miranda* advisement are not admissible in the prosecution's case-in-chief (unless the suspect voluntarily, knowingly, and intelligently waives

4

his rights, an issue not relevant to this appeal).  *See Sanchez v. People*, 2014 CO 56, ¶ 11.

¶ 11     The prosecution concedes, and we agree, that the entire interaction was an interrogation.  The question therefore becomes whether all or part of that interrogation was custodial.

¶ 12     To answer that question, we apply an objective test.  We ask whether a reasonable person in Eugene's position would have believed that his freedom of action had been curtailed to a degree associated with a formal arrest.  *Id.* at ¶ 18.  Our supreme court has made clear that we are to holistically analyze the totality of the circumstances in each particular case.  *Id.*  No single fact or factor is determinative.  *See People v. Matheny*, 46 P.3d 453, 466 (Colo. 2002).  That said, our supreme court has identified a nonexhaustive list of factors that courts should consider.  *Id.*  They are

> (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant

during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.

*Id.* at 465-66 (quoting *People v. Trujillo*, 938 P.2d 117, 124 (Colo. 1997)).

## B. The Last Part of Eugene's Interrogation was Custodial

¶ 13     With the above law to guide us, we now review de novo whether the totality of the circumstances rendered Eugene's interrogation custodial at any point. We conclude that although the interrogation was not custodial at the beginning, it became custodial toward the end.

¶ 14     The interrogation began with two officers knocking on the door of Eugene's apartment in the middle of the day. Eugene came to the door, Officer Thivierge asked if he wanted to come talk outside, and Eugene said "sure." Eugene's wife followed Eugene and the officers outside the building, and they began to talk in front of the building's door.

¶ 15     The interrogation unfolded in three distinct phases: first, Officer Thivierge spoke to Eugene and his wife, and then Eugene alone, outside; second, Officer Thivierge went inside and spoke to Eugene's wife while Eugene remained outside accompanied by

6

another officer; and third, Officer Thivierge spoke to Eugene outside again with other officers present.

¶ 16    The entire interaction lasted over twenty-seven minutes. Eugene was never physically restrained.  Nevertheless, based on the totality of the circumstances, we conclude that at the beginning of the third phase of the interrogation, a reasonable person in Eugene's position would have believed that his freedom of action was curtailed to a degree associated with a formal arrest.

¶ 17    Officer Thivierge's tone throughout the interrogation was accusatory and confrontational.  He raised his voice on more than one occasion, though he did not yell at any point.  At the beginning, Officer Thivierge asked Eugene and his wife whether they had been in a road rage incident two days earlier.  Eugene's wife started to answer, but Officer Thivierge cut her off, extended his hand outward gesturing her to stop, and talked over her, saying "stop" repeatedly and "before you start making up stories . . . how do you think we found you and [Eugene]?"  Minutes later, Officer Thivierge asked Eugene's wife to go inside so he could speak to her and Eugene separately.  For the remainder of this first phase of the

7

interrogation, the second officer stood between Eugene and the door to the apartment building, keeping his hand on the door handle.

¶ 18    After Eugene's wife went inside, Eugene recounted his version of the fight. Officer Thivierge told him, "I don't believe you." Officer Thivierge also falsely and repeatedly suggested that there was video footage of the fight, saying "[W]hat if I were to tell you that there was a camera that caught the incident and in that incident, somebody had a knife and cut the driver of that car enough to cause serious bodily injury to his body, what if I were to tell you that?" Officer Thivierge later asked, "[W]hat if that camera caught you doing it, what would you say to that?" And then, "[W]hat if I also told you that you were driving that car because cameras showed you getting in the driver's seat of that car and driving away?" Eugene maintained that he did not have a weapon, the other driver swung first, and he did not punch the other driver.

¶ 19    At the end of the first phase, Officer Thivierge told Eugene he was going inside to speak to his wife. Eugene asked to go inside and use the bathroom. Officer Thivierge denied that request, saying "[I]n a second, I'm just gonna go talk to her real quick." As a result,

Eugene stayed outside with the second officer for fourteen minutes while Officer Thivierge went inside and spoke to Eugene's wife.

¶ 20     By the time Officer Thivierge returned outside, a third officer had arrived and was standing with Eugene and the second officer. The third phase of the interrogation began, with the second officer again standing between Eugene and the door of his apartment building. Officer Thivierge listed some of his perceived inconsistencies in Eugene's version of the incident and asked, "[W]hy do you keep lying?" Eventually, Eugene admitted to having punched the other driver but insisted that the other driver swung first.

¶ 21     We agree with the trial court that during the first phase of the interrogation, Eugene was not in custody for *Miranda* purposes. But when Officer Thivierge returned outside and the third phase began, the interrogation became custodial. *See People v. Horn*, 790 P.2d 816, 818 (Colo. 1990) (initial voluntariness of a person's presence does not preclude the determination that his presence is thereafter custodial in nature). At that point, Eugene had been outside with officers for over twenty-two minutes. *See People v. Cleburn*, 782 P.2d 784, 786 (Colo. 1989) (concluding the defendant

9

was in custody relying, in part, on a finding that the twenty-to-thirty-minute interrogation was "relatively long"). The officers had directed — and then maintained — Eugene's separation from his wife. *Cf. Effland v. People*, 240 P.3d 868, 875 (Colo. 2010) (excluding daughter from interrogation included among several factors in favor of finding custodial interrogation). While calm, Officer Thivierge had spoken to him accusatorily and confrontationally throughout. *See People v. Minjarez*, 81 P.3d 348, 357 (Colo. 2003) (interrogation was custodial where the defendant was subject to repeated accusations and the mood in the room was tense and confrontational). Officer Thivierge had repeatedly misrepresented that video footage of the incident existed and had told Eugene, "I don't believe you." *Cf. Matheny*, 46 P.3d at 467 (interrogation was not custodial because officers "were completely honest with Defendant"); *Minjarez*, 81 P.3d at 357 (interrogation was custodial where questions were coercive and intended to force agreement from the defendant). The second officer had been positioned between Eugene and the door to the building with his hand on the door, and a third officer had arrived. *See People v. Alemayehu*, 2021 COA 69, ¶ 78 (considering number of officers

present as relevant to custody determination). And Officer Thivierge had denied Eugene's request to go inside his own home and use the bathroom. *Cf. People v. Davis*, 2019 CO 84, ¶ 31 (no custody in part because the defendant was permitted to return to his bedroom to retrieve his glasses and phone). At this point, a reasonable person in Eugene's position would feel that his freedom of action was curtailed to a degree associated with a formal arrest.

¶ 22 We therefore conclude that, based on the totality of the circumstances, Eugene was in custody for *Miranda* purposes during the third phase of the interrogation.

¶ 23 The dissent supports its contrary conclusion by identifying numerous individual facts that were present in cases where the suspect was in custody and noting the absence of those facts here (for example, the use of physical restraints, the drawing of a weapon, and a detention lasting an hour or more). It also identifies things the officers could have done but did not (e.g., they did not show up at night, they did not conduct a search beyond a pat-down of Eugene, and they did not crowd or surround Eugene). While not inappropriate, we find this analysis unpersuasive. The legal standard we must apply does not focus on the presence or absence

11

of individual factors standing alone.  Instead, the legal standard requires us to focus on the combined effect of the inherently unique facts of a given case.

¶ 24     The facts here were that at the beginning of the third phase of the interrogation, the interaction had already lasted at least twenty-two minutes;[1] Officer Thivierge consistently spoke to Eugene in a confrontational and accusatory tone throughout the interrogation; Officer Thivierge had directed and maintained Eugene's separation from his wife; Officer Thivierge had denied Eugene's request to go inside his apartment to use the bathroom; Officer Thivierge had lied about the existence of video footage and asked Eugene why *he* was lying; and a third officer had arrived.  We conclude that Eugene was in custody during the third phase of the interrogation based on this

---

[1] The dissent states that Eugene was only interrogated for a total of "about eleven minutes and forty-five seconds."  *Infra* ¶ 61.  Technically, this is true.  Officer Thivierge actively interrogated Eugene for a total of eleven minutes and forty-five seconds.  But we cannot ignore the fact that in between the first and third phases of the interrogation, after Officer Thivierge denied Eugene's request to go inside his own home and use the bathroom, Eugene was made to stand outside with the non-interrogating officer (and eventually a third officer) for over fourteen minutes.  This additional fourteen minutes of detention is certainly part of the totality of the circumstances we must consider when making a custody determination.

inherently unique combination of facts and circumstances. *See People v. Marko*, 2015 COA 139, ¶ 56 (custody determination for purposes of *Miranda* must be made on a case by case basis).

¶ 25    Officers failed to give Eugene a *Miranda* advisement before the third phase. The trial court therefore violated Eugene's Fifth Amendment rights by failing to suppress Eugene's statements from this third phase.[2]  Based on this conclusion, we now turn to whether this constitutional error requires reversal.

## C. Reversal is Required

¶ 26    A constitutional error requires reversal unless it was harmless beyond a reasonable doubt. *Hagos v. People*, 2012 CO 63, ¶ 11. Under this standard, we must reverse if there is any reasonable possibility that the error might have contributed to the conviction. *Id.*  Once constitutional error has been found, the prosecution has the burden to prove that the error does not require reversal under this standard. *Id.*

---

[2] We emphasize that officers are free to use confrontational and coercive techniques that amount to custodial interrogation — as long as they advise the suspect of his Fifth Amendment rights before doing so.

¶ 27    Having determined that there was constitutional error, we conclude that the prosecution has failed to carry its burden to show that reversal is unnecessary. The prosecution's entire argument on this issue in the briefs is a single sentence: "Nonetheless, the admission of the statements would be harmless beyond a reasonable doubt in light of the overwhelming evidence demonstrating that the Defendant was the initial aggressor." The prosecution does not explain what constitutes overwhelming evidence in general, nor does it identify the specific evidence that is supposedly overwhelming here. Although the prosecution followed its single sentence of argument with a record citation, more is required to develop an argument to the point that we will address it as sufficiently raised on appeal, let alone to the point that it satisfies the prosecution's heavy burden to disprove the necessity of reversal. *See People v. Leverton*, 2017 COA 34, ¶ 65 (rejecting a constitutional argument because "it was not sufficiently developed and we do not address skeletal arguments"); *People v. Mendenhall*, 2015 COA 107M, ¶ 49 (describing the prosecution's burden to prove harmlessness beyond a reasonable doubt as "heavy"); *People v. Simpson*, 93 P.3d 551, 555 (Colo. App. 2003) (declining to consider

14

"a bald legal proposition presented without argument or development").

## III.  Conclusion

¶ 28    The judgment of conviction is reversed, and the case is remanded for retrial in accordance with this opinion.

JUDGE KUHN concurs.

JUDGE BERNARD dissents.

JUDGE BERNARD, dissenting.

¶ 29    The majority concludes that defendant was in custody at the end of the encounter in this case when he made incriminating statements to the investigating officer. The majority continues that the officer was, therefore, obligated to inform defendant of his *Miranda* rights before questioning him further. As a result, the majority finishes up, those statements should not have been admitted at defendant's trial, and, because they were, his conviction must be reversed. I disagree because I conclude that defendant was not in custody at any time during the interrogation, so the officer was not required to inform him of his *Miranda* rights. I therefore respectfully dissent.

## I.  Defendant Was Not in Custody When the Investigating Officer Interrogated Him

### A.  The Interrogation

¶ 30    The video of the interrogation came from a body camera that the investigating officer was wearing. It is about twenty-seven minutes long. Its first minute and forty seconds consist of the investigating officer, who was accompanied by a second officer, knocking on the door of defendant's apartment and then waiting for

16

defendant's wife to bring defendant to the door.  (The second officer said very little during the entire video.)

¶ 31    In a conversation in the hallway outside the apartment that lasted only a few seconds, the investigating officer asked defendant to go outside to talk.  Defendant agreed.  The tone of this short conversation was calm and friendly.

¶ 32    The two officers and defendant went outside into the daylight, and they stood by a door to the apartment building.  The investigating officer asked defendant whether he was carrying any weapons.  Defendant said "no," and the officer told defendant that he was going to "pat [defendant] down real quick."  He did so, and did not find any weapons.

¶ 33    As the investigating officer began to ask defendant questions, defendant's wife came outside.  The officer wanted to know if either of them had driven their car on the day of the road rage incident that led to the charges in this case.  When the officer asked defendant's wife whether she and defendant had been involved in that incident, she said "no."  The officer immediately raised his voice some — he was not yelling — and interrupted defendant's

17

wife, assertively telling her, "Stop.  Before you go making up stories, how do you think we found you and [defendant]?"

¶ 34    Defendant's wife then admitted that they had been involved in the incident, although she portrayed the victim as the aggressor.

¶ 35    The officer then asked defendant some questions while defendant smoked a cigarette.  The officer's tone during this questioning was calm and matter of fact.  After about three and a half minutes, the officer asked defendant's wife to "do him a favor," adding that he wanted to talk with defendant alone and that he would speak with her separately.  She went back inside.

¶ 36    The investigating officer made more inquiries of defendant, again in a calm and matter-of-fact tone of voice.  About a minute into them, the officer asked, "What if I were to tell you that there was a camera that caught the incident, and, in that incident, somebody had a knife and cut the driver of that car enough to cause serious bodily injury to his body?  What if I were to tell you that?"  (The record does not contain any indication that there was such a camera.  It is therefore reasonable to suppose that the officer made this up.)  Defendant denied having a knife or cutting anyone.  At one point, the officer told defendant that he did not believe him

when defendant said that "nothing else happened." Defendant denied doing anything more than pushing the victim.

¶ 37    Defendant asked the officer if he could "run in" and use the bathroom. The officer replied, "In a second. I'm just going to go talk to [defendant's wife] really quick, okay?"

¶ 38    This part of the interrogation — between when defendant's wife left and when the investigating officer went inside — lasted about four and three-quarter minutes. So, up to this point, the investigating officer had questioned defendant outside the apartment for about eight minutes and fifteen seconds.

¶ 39    The investigating officer then went inside for about thirteen minutes and forty-five seconds, and he spoke with defendant's wife in the hallway outside defendant's apartment for most of this time. During this interrogation, a third officer showed up. The investigating officer directed the third officer to remain outside with defendant and the second officer. (Like the second officer, the third officer said little that was captured by the investigating officer's body camera.)

¶ 40    Although defendant's wife denied that defendant had been armed with a knife during the incident or that he had cut the victim

with it, she admitted for the first time that defendant had punched the victim.

¶ 41    While the investigating officer questioned defendant's wife inside the apartment building, defendant was outside of the apartment with the other two officers.  The building's door was closed, and the video from the investigating officer's body camera does not show what anyone was doing outside, and it did not capture what anyone outside may have said.

¶ 42    When the investigating officer went back outside, he spoke to defendant in a matter-of-fact, calm way.  Defendant was leaning against a car, talking with the other officers.  The investigating officer asked defendant, "Do you see how this looks right now?" and "Why do you keep lying?"  He confronted defendant with the inconsistencies in defendant's story, explaining that defendant's wife said that defendant had punched the victim.  Defendant then admitted, for the first time, that he had punched the victim.  But he continued to deny that he had been armed with, or had used, a knife.  The officer then told defendant that "[i]t looks so bad right now" because the victim had stayed at the scene and called the

police while defendant and his wife had left.  At that point, the officer again raised his voice, but he was not yelling.

¶ 43     The officer told defendant that he was going to call the detective who was handling the case, and he began to walk to his car.  The video ended.

¶ 44     This last part of the interrogation lasted about three minutes. The investigating officer's entire interrogation of defendant lasted approximately eleven and one-quarter minutes.

¶ 45     There is no indication in the record, including in the video from the investigating officer's body camera, that any of the officers told defendant that he could not leave or that defendant expressed any desire to leave.  The officers did not yell at him or at his wife; they did not call him or his wife any names; and they did not threaten him or his wife.  They did not arrest defendant after the interrogation.  That came later.

## B.  The Law

¶ 46     "*Miranda* sought to address the problem of how the Fifth Amendment privilege against compelled self-incrimination could be protected from 'the coercive pressures that can be brought to bear upon a suspect in the context of custodial interrogation.'"  *People v.*

21

*Davis*, 2019 CO 84, ¶ 16 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 428 (1984)). "Given the Fifth Amendment concerns that animated the decision, *Miranda* warnings are required only 'when a suspect is subject to both custody and interrogation.'" *Id.* (quoting *Effland v. People*, 240 P.3d 868, 873 (Colo. 2010)). There is no question in this case that the investigating officer interrogated defendant; the central question is whether defendant was in custody for purposes of *Miranda* during any part of the interrogation.

¶ 47     "Custody for [the purposes of *Miranda v. Arizona*, 384 U.S. 436, 444 (1966),] under the Fifth Amendment is determined under a different analysis from that applied to determine whether there has been a seizure under the Fourth Amendment." *People v. Stephenson*, 159 P.3d 617, 620 (Colo. 2007). "A seizure results under the Fourth Amendment where the police conduct in question 'would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.'" *Id.* (quoting *People v. Jackson*, 39 P.3d 1174, 1182 (Colo. 2002)).

¶ 48    Under the Fifth Amendment, "the safeguards prescribed by

*Miranda* become applicable as soon as a suspect's freedom of action

is curtailed to 'a degree associated with formal arrest.'" *Berkemer*,

468 U.S. at 440 (quoting *California v. Beheler*, 463 U.S. 1121, 1125

(1983)).

> Under *Berkemer*, the question [of whether a
> defendant is in custody for the purposes of
> *Miranda*] is *not* whether a reasonable person
> would believe he was not free to leave, but
> rather whether such a person would believe he
> was in police custody of the degree associated
> with a formal arrest.

*People v. Polander*, 41 P.3d 698, 705 (Colo. 2001).

¶ 49    The distinction between custody and arrest, on the one hand,

and a brief investigatory detention, on the other hand, is significant.

"Mere detention does not deprive a person of his freedom to the

degree associated with a formal arrest." *Davis*, ¶ 20. "[A]lthough

relevant to the analysis, detention alone is not dispositive of a

custody determination." *Id.* While "an investigatory detention

constitutes a 'seizure' for purposes of the Fourth Amendment, such

detention does not necessarily mean that the suspect is 'in custody'

for purposes of *Miranda*." *Id.* "In the *Miranda* context, "'custody" is

a term of art that specifies circumstances that are thought generally

to present a serious danger of coercion.'"  *Id.* at ¶ 17 (quoting *Howes v. Fields*, 565 U.S. 499, 508-09 (2012)).

¶ 50    "This is not to say that *Miranda* can never be implicated during a valid investigatory detention.  A court must examine the facts and circumstances of the encounter to determine whether *Miranda* applies."  *Id.* at ¶ 21.  "If a person detained pursuant to an investigatory stop 'thereafter is subjected to treatment that renders him "in custody" for practical purposes, he will be entitled to the full panoply of protections prescribed by [*Miranda*].'"  *Id.* (quoting *Berkemer*, 468 U.S. at 440).

¶ 51    What conduct during an investigatory stop triggers *Miranda*'s protections?  For example, "*Miranda* rights are . . . implicated when police detain a suspect using a degree of force more traditionally associated with concepts of 'custody' and 'arrest' than with a brief investigatory detention."  *Polander*, 41 P.3d at 705.

¶ 52    What is the degree of force traditionally associated with concepts of custody and arrest?  If, for example, a "police officer uses physical restraint on the suspect, or draws a gun[, the encounter] is more likely to be deemed custodial."  *People v. Breidenbach*, 875 P.2d 879, 886 (Colo. 1994)(quoting *People v.*

*Herdan*, 116 Cal. Rptr. 641, 645 n.11 (Ct. App. 1974)). Physical restraint includes handcuffing, holding a suspect by the arm, or placing the suspect in a police car. *People v. Holt*, 233 P.3d 1194, 1197-98 (Colo. 2010). "[T]he lack of physical restraint suggests . . . that [a defendant] [is] not in custody." *People v. Cowart*, 244 P.3d 1199, 1204 (Colo. 2010). And an officer's statement that a suspect will not be released after an interrogation is also indicative of an arrest. *People v. Figueroa-Ortega*, 2012 CO 51, ¶ 8.

¶ 53    To decide whether the police have placed a person in custody for the purposes of *Miranda*, a court considers the totality of the circumstances. *Cowart*, 244 P.3d at 1203. This is an objective test. *Id.* As part of that consideration, *Cowart*, among other decisions from our supreme court, including the one cited by the majority, directs trial courts to consider a series of nine nonexclusive factors. *Id.* None of these factors alone is determinative. *People v. Barraza*, 2013 CO 20, ¶ 17. The majority has listed these factors in paragraph 12 of its opinion.

## C. Analysis

¶ 54    I think that a reasonable argument could be made that defendant was not detained at all and that the encounter with the

officers was consensual. For example, there is no indication that any officer told defendant that he had to talk with them, that he had to go outside with them, that he had to remain with them outside, that he could not just walk away from the interrogation, or that he was under arrest. But, for the purposes of this dissent, I will assume that defendant was not free to leave during the police interrogation and that he was, therefore, the subject of an investigatory detention.

¶ 55    I base this assumption on the following facts from the interrogation: (1) the investigating officer asked defendant to go outside; (2) the officer patted defendant down once they got outside; (3) after speaking with defendant and his wife together, the officer asked defendant's wife to leave so that the officer could ask defendant questions; (4) the officer told defendant to wait a "second" to go to the bathroom because the officer wanted to interview defendant's wife; (5) the officer raised his voice, although he did not yell, when speaking with defendant's wife in defendant's presence and when talking with defendant near the end of the interrogation; (6) the officer told defendant that he did not believe defendant, and he confronted defendant with new information that he had learned

26

from defendant's wife; (7) the officer told defendant that a camera had recorded the road rage incident, which apparently was not true; and, (8) for almost the entire encounter, there were two police officers with defendant, and, at the end, three.

¶ 56 Even making this assumption, I nonetheless conclude, for the following reasons, that, based on the totality of the circumstances, the officers did not do anything to escalate the investigatory detention into the level of custody that would require the investigating officer to read defendant his *Miranda* rights before questioning him. *See Davis*, ¶¶ 20-21.

¶ 57 First, the investigatory detention that I assume occurred did not automatically equal custody for *Miranda*'s purposes because such a "mere detention" did not deprive defendant of his freedom to the degree associated with a formal arrest. *See id.* at ¶ 20; *see also People v. Begay*, 2014 CO 41, ¶ 20 ("Is . . . a suspect [detained during an investigatory stop] seized under the Fourth Amendment? Typically, yes. Does that mean he is in custody under the Fifth Amendment? Not necessarily — investigatory detention of this sort may occur without the degree of restraint associated with a formal arrest."). And defendant's putative detention would not be

"dispositive of a custody determination" for purposes of *Miranda*. *See Davis*, ¶ 20.

¶ 58    Second, the test for custody "is *not* whether a reasonable person would believe he was not free to leave." *Polander*, 41 P.3d at 705; *see also Begay*, ¶ 16 (A "trial court errs by applying the 'free to leave' standard in evaluating whether a suspect is in custody under the *Miranda* doctrine."). So, even if defendant reasonably felt that he was not free to leave, that, by itself, was not enough to establish that defendant was in custody under *Miranda*.

¶ 59    Third, defendant's putative detention was more "typical of an investigatory stop" than of an arrest. *See Begay*, ¶ 20; *Figueroa-Ortega*, ¶ 8. An investigatory detention is an intermediate "level of police response or limited seizure, and it may be proper in 'narrowly defined circumstances upon less than probable cause.'" *People v. Garcia*, 11 P.3d 449, 453 (Colo. 2000)(quoting *People v. Archuleta*, 980 P.2d 509, 512 (Colo. 1999)). It must be brief, limited in scope, and narrow in purpose, and, to justify such a detention, the police "must have an articulable and specific basis in fact to believe that an individual is committing, has committed, or is about to commit a crime." *Id.* In this case, the detention was brief, its scope was

limited to questioning defendant and his wife, and the investigating officer clearly had an articulable and specific basis to believe that defendant had been involved in the road rage incident.

¶ 60 There are no rigid time limitations on investigative detentions. *Davis*, ¶ 36. "[W]hen determining whether a detention is too long in duration," which would turn an investigative detention into an arrest for Fourth Amendment purposes, "it is appropriate to examine whether police were diligent in pursuing a means of investigation likely to resolve their suspicions quickly." *People v. Lidgren*, 739 P.2d 895, 896 (Colo. App. 1987).

¶ 61 In this case, the investigating officer only interrogated defendant for about eleven minutes and forty-five seconds. And the entire encounter lasted twenty-five and a half minutes. (Remember that about the first minute and forty seconds were taken up by knocking on the door to defendant's apartment and asking for him.) This was not an unreasonable time, particularly because the encounter lasted only long enough for the investigating officer to question defendant and his wife together and then apart. *See id.*; *see also United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995)("We decline to hold that a thirty minute detention based on reasonable

suspicion is, *per se*, too long."); *Davis*, ¶ 36 (a detention that lasted eighty-five minutes was not too long under the circumstances); *People v. Ortega*, 34 P.3d 986, 993 (Colo. 2001)(a detention that lasted between twenty and thirty minutes was not too long under the circumstances).

¶ 62    Fourth, the police did not use force "more traditionally associated with concepts of 'custody' and 'arrest' than with a brief investigatory detention." *Polander*, 41 P.3d at 705.  The officers did not point their weapons at defendant or at his wife, and they did not otherwise display them.  They did not place defendant in any restraints, such as handcuffs.  They did not grab him by the arm to direct him, and they did not manhandle him in any way.  They did not question him in the police station behind a locked door or in a police car.  *See People v. Pleshakov*, 2013 CO 18, ¶ 32 (A suspect was not in custody for *Miranda* purposes because, in part, the police did not "brandish their weapons, use handcuffs, or otherwise exhibit the type of force generally associated with arrest."); *Cowart*, 244 P.3d at 1204; *Breidenbach*, 875 P.2d at 886.  As a result, the lack of physical restraint suggests that he was not in custody during the interrogation.  *See Cowart*, 244 P.3d at 1204.

¶ 63    The investigating officer never told defendant that he could not leave or that he would not be released after the interrogation. *See Figueroa-Ortega,* ¶ 8. And, even if I assume that the officer directed defendant to talk with him outside, instead of defendant voluntarily agreeing to do so, the officer's direction does not suggest that defendant was in custody. *See Stephenson,* 159 P.3d at 622 ("[R]equiring a defendant to exit her vehicle was not custody for purposes of *Miranda.*").

¶ 64    Although I think that the absence of these things from this case has significant persuasive force, I recognize that their absence does not automatically mean that defendant was not in custody when the police questioned him. *See Davis,* ¶ 21. It is certainly possible that, even in the absence of these things, a suspect might reasonably believe that his or her freedom of action has been curtailed to a degree associated with formal arrest. *See id.*

¶ 65    Fifth, the investigating officer interrogated defendant outside his apartment building. "The location of the interaction is significant." *People v. Cline,* 2019 CO 33, ¶ 21 (listing cases in which police-suspect encounters that occurred outside the suspect's home weighed against a determination that the suspect

was in custody). This is because "the *Miranda* warnings were expressly developed as an added protection against 'incommunicado interrogation of individuals in a police-dominated atmosphere.'" *Figueroa-Ortega,* ¶ 7 (quoting *Miranda,* 384 U.S. at 445).

¶ 66 "When the interaction occurs at the person's home or at a familiar location, it weighs against a finding of custody." *People v. Garcia,* 2017 CO 106, ¶ 21. "[T]he area just outside a familiar residence can be a neutral location." *Id.* The interrogation in this case therefore did not occur in a "police-dominated setting." *See Davis,* ¶ 29; *Begay,* ¶ 22 (Because traffic stops and "show-up" identifications normally occur in public, "the potential that police will use coercive tactics to compel a confession is diminished.").

¶ 67 The officers did not show up at night or in the early morning hours; they came to defendant's apartment in the daytime. This, too, weighs against a determination that defendant was in custody during the interrogation. *See Cline,* ¶ 22; *Pleshakov,* ¶ 32 (A suspect was not in custody for *Miranda* purposes, in part, when the encounter occurred in "daylight . . . on a sidewalk, in plain view of any person who might be passing by.").

¶ 68     Sixth, beyond the initial pat-down search, the officers did not search defendant, his wife, or his apartment, and they did not otherwise discover any incriminating evidence. *See People v. Thomas*, 839 P.2d 1174, 1178 (Colo. 1992)(a roadside encounter after a traffic stop became custodial for the purposes of *Miranda* when a search of the suspect's person turned up incriminating evidence in the form of a marijuana pipe).

¶ 69     Seventh, the presence of three officers "would not, in and of itself, lead a reasonable person to believe that he or she had been subjected to restraint akin to a formal arrest." *People v. Alemayehu*, 2021 COA 69, ¶ 78. This conclusion is reinforced by the fact that, on the body camera recording, there is no indication the officers crowded or surrounded defendant or backed him up against a wall. *See id.* at ¶ 78 n.11; *Pleshakov*, ¶ 32 (The suspect "was not confined or encircled by police officers.").

¶ 70     Eighth, it appears to me that the investigating officer tried to persuade defendant to admit that he had participated in the road rage incident and that he had cut the victim with a knife. But "persuasion is not coercion, and the atmosphere and tone of the interview . . . did not evince any attempt" by the officer to subjugate

33

defendant to his will. *People v. Matheny*, 46 P.3d 453, 467 (Colo. 2002). "The extent to which a police officer's tone of voice and demeanor can be characterized as confrontational and accusatory" is more relevant to deciding whether the police have engaged in a consensual encounter with a suspect or an investigatory stop, as opposed to deciding whether a suspect was in custody for the purposes of *Miranda*. *Figueroa-Ortega*, ¶ 10. "[M]erely confronting a suspect with the evidence against him and threatening, no matter how confidently, to charge him with a crime at some point in the future does not, by itself," infringe upon his or her liberty, much less infringe upon it to the degree "associated with a formal arrest." *Id.* And "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). The body camera footage does not show any officer screaming at defendant, calling him names, belittling him, or threatening him or his wife.

¶ 71    Ninth, defendant did not appear to be cowed, and he did not act like his will had been overborne. His responses to the

34

investigating officer's questions were direct, he did not confess to cutting the victim, and the footage from the body camera does not suggest that defendant had succumbed to "any allegedly coercive police influences." *See People v. Clark*, 2020 CO 36, ¶ 34 (quoting *Garcia*, ¶ 36). He consistently deflected the officer's questions, and he accused the victim of being the initial aggressor. *See id.*

¶ 72 He responded to the investigating officer's questions, many of which were open-ended, in a narrative form rather than in "short-form responses to directed questions." *See People v. Sampson*, 2017 CO 100, ¶ 27. Although he was animated at times, he did not appear to be distraught. He seemed calm, and he never told the police that he wanted the interrogation to end. *See People v. Travis*, 2016 COA 88, ¶ 17, *rev'd on other grounds*, 2019 CO 15. He did not tell the officers to leave, he did not say that he would not speak with them, and he did not ask for an attorney. *See People v. Theander*, 2013 CO 15, ¶ 34.

¶ 73 The officer's misrepresentation that a camera had recorded the road rage incident was not so compelling or coercive that, upon hearing it, defendant confessed to cutting the victim with a knife. "Ploys to mislead a suspect or lull him into a false sense of security

that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns."  *Illinois v. Perkins*, 496 U.S. 292, 297 (1990); *cf. Frazier v. Cupp*, 394 U.S. 731, 739 (1969)(police misrepresentations, although relevant, were not enough to turn an otherwise voluntary confession into an involuntary one).  "[T]rickery is not automatically coercion.  Indeed, the police commonly engage in such ruses as suggesting to a suspect that a confederate has just confessed or that police have or will secure physical evidence against the suspect."  *United States v. Byram*, 145 F.3d 405, 408 (1st Cir. 1998).

¶ 74     At this point in my analysis, I am reminded that, while discussing Fourth Amendment issues, Professor Wayne LaFave once wrote about the importance of providing the police with clear rules to "regulate . . . their day-to-day activities."  Wayne R. LaFave, *"Case-By-Case Adjudication" Versus "Standardized Procedures"*: *The Robinson Dilemma*, 1974 Sup. Ct. Rev. 127, 141.  While this is a Fifth Amendment case involving the issue of whether defendant was in custody for the purposes of *Miranda*, I think that Professor LaFave's admonition is equally pertinent because our Fifth Amendment jurisprudence regulates the conduct of police officers

in the field when questioning suspects. Our guidance should, therefore, "be expressed in terms that are readily applicable by the police in the context of the law enforcement activities in which they are necessarily engaged." *Id.* "A highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances" may be impossible for police officers to apply. *Id.* Rather, a "single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." *Dunaway v. New York*, 442 U.S. 200, 213-14 (1979); *see People v. Hufnagel*, 745 P.2d 242, 246 n.2 (Colo. 1987)(search and seizure case).

¶ 75    The United States Supreme Court has used this approach when discussing *Miranda.* For example, in *New York v. Quarles*, 467 U.S. 649, 658 (1984), the Court "recognize[d] . . . the importance of . . . workable rule[s]." And, in *Yarborough v. Alvarado*, 541 U.S. 652, 668 (2004), the Court noted that "the custody inquiry states an objective rule designed to give clear guidance to the police." Colorado's supreme court quoted this language approvingly in *Cowart*, 244 P.3d at 1204. Indeed,

Colorado's test for deciding whether a suspect was in custody during a police interrogation is the same as the United States Supreme Court's test. *See Matheny*, 46 P.3d at 467.

¶ 76 This test is the sort of workable, objective rule that can reasonably guide the police. It avoids the "ifs, ands, and buts and . . . the drawing of subtle nuances" that Professor LaFave warned against because (1) it is an *objective* test, *see Cowart*, 244 P.3d at 1203; that (2) asks whether a *reasonable* person would believe that he or she "was in police custody of the degree associated with a formal arrest," *Polander*, 41 P.3d at 705; and that (3) focuses on whether the circumstances in question "are thought generally to present a *serious danger* of coercion," *Davis*, ¶ 17 (emphasis added)(quoting *Howes*, 565 U.S. at 508-09). So it is critically important, when employing this multi-factor, totality-of-the-circumstances test, to evaluate what the police and the suspect did and said *as well as* what they did not do and what they did not say.

¶ 77 Obviously, the custody test will be applied to an enormous number of factually different scenarios. Change one fact in a scenario, and the result could well change. And because the test

requires us to review the totality of the circumstances, it must be flexible enough to recognize the potentially vast differences from case to case.

¶ 78    There are, for example, cases in which it is abundantly clear that a suspect was in custody when questioned.  Everyone would agree that, if several officers drew their weapons, forced a suspect facedown on the ground, handcuffed her, transported her to the police station in a patrol car, and interrogated her in a small, windowless room while she was still handcuffed, then the suspect was in custody.

¶ 79    On the other end of the spectrum, there are cases in which it is equally evident that the suspect was not in custody when questioned.  Everyone would again agree that, if an officer approached a suspect on the street, politely asked permission to speak with him, spoke in a conversational tone of voice, never drew a weapon, never put his hands on the suspect, never gave him any orders, never limited his freedom of movement, and immediately respected his request to terminate the encounter, then the suspect was not in custody.

¶ 80    There are many cases that fall somewhere in between these two hypotheticals.  But, for me, this case is closer to the not-in-custody end of the spectrum than the in-custody end.

¶ 81    After considering the nonexclusive factors, looking objectively at the totality of the circumstances, *see Cowart*, 244 P.3d at 1203, and recognizing that none of the nonexclusive factors alone is determinative, *see Barraza*, ¶ 17, I conclude that a reasonable person in defendant's position would not have believed that he or she was in police custody of the degree associated with formal arrest, *see Polander*, 41 P.3d at 705.

¶ 82    When looking at the factors indicating that defendant was not in custody, I note that the police did not draw their guns or any other weapons.  They did not handcuff him or otherwise restrain him.  Aside from the pat-down search, they did not touch him; they were never physically aggressive.

¶ 83    The investigating officer interrogated defendant outside his apartment complex in the daylight, where other people could see the encounter.  The officers did not surround him or stand unreasonably close to him; they did not back him up against a wall.

They did not tell him that he was under arrest, that he was required to speak with them, or that he could not leave.

¶ 84    The interrogation was mostly matter of fact, and it was not unreasonably long.  The officers did not threaten defendant, yell at him, or berate him.  Defendant did not seem overwhelmed by the questioning, and, although he admitted punching the victim, he did not admit that he had cut the victim with a knife.  The officers did not arrest him at the end of the interrogation.  And, even if defendant was not free to leave because he was the subject of an investigatory detention, he was not restrained to the degree associated with a formal arrest.  *See Davis*, ¶ 20; *Polander*, 41 P.3d at 705.

¶ 85    Turning to the factors that might indicate that defendant was in custody, the investigating officer was occasionally confrontational and accusatory when questioning defendant and his wife, twice raising his voice.  It appears from the record that the officer misrepresented the status of the evidence.  The officer first separated defendant from his wife, then directed defendant to stay outside while the officer questioned her, and, in doing so, told defendant that he should wait "a second" before returning to his

apartment to use the bathroom.  At least two, and, at the end, three officers were with defendant during the entire encounter.

¶ 86    When considered as a whole, these factors indicate to me, at the most, that defendant was the subject of an investigatory detention, not that he was in custody for the purposes of *Miranda*. All in all, I think that the factors indicating that defendant was not in custody are much more persuasive than the factors indicating that he was in custody, particularly because the latter factors were not coercive.

¶ 87    I conclude that defendant was not in custody throughout the entire interrogation and, therefore, that the officer was not required to advise him of his *Miranda* rights.  This means that I further conclude that the trial court did not err when it allowed the prosecution to introduce all the statements that defendant made during the interrogation into evidence during his trial.

¶ 88    Because I reach these conclusions, I will briefly address the other four issues that defendant raised in his opening brief.

II.  Other Issues

A.  Instructions

¶ 89    Defendant contends that the trial court should have read the jury self-defense instructions that he had proposed: the first concerned whether defendant had acted reasonably; the second addressed apparent necessity; and the third explained the concept of no duty to retreat.  He then asserts that one reason why the court should have given the jury the first two instructions was that he had faced multiple assailants — the victim and a passenger in the victim's car — during the road rage incident.  I disagree.

¶ 90    "[W]hether to give a particular instruction lies within the trial court's discretion, and [an appellate court] will not disturb the court's ruling absent a showing that the court abused its discretion in rejecting a particular instruction." *People v. Gwinn*, 2018 COA 130, ¶ 31.  An appellate court reviews the question of whether a trial court accurately instructed the jury on the law de novo. *Pettigrew v. People*, 2022 CO 2, ¶ 32.

¶ 91    I conclude that the trial court did not err when it rejected defendant's proposed instructions concerning

- whether he had acted reasonably because the self-defense instructions that the court gave the jury repeatedly referred to defendant's "reasonable belief";

- apparent necessity because the self-defense instructions that the court read to the jury tracked the self-defense statute, thus incorporating the concept of apparent necessity, *see Beckett v. People*, 800 P.2d 74, 78 (Colo. 1990); and

- no duty to retreat because the jury in this case was instructed that defendant "was legally authorized to use physical force upon another person *without first retreating*" (emphasis added).

¶ 92    Turning to defendant's contention that the court should have read the first two instructions to the jury because he faced multiple assailants, he did not raise it in the trial court.  I therefore conclude that any error that the court may have committed was not plain because it was not obvious and because it did not so undermine the trial's fairness as to cast serious doubt on the fairness of his trial. *People v. Counterman*, 2021 COA 97, ¶ 64.  I further conclude that defendant has not shown that the lack of these instructions contributed to his conviction.  *Id.* at ¶ 65.

¶ 93    The testimony in this case established that the passenger in the victim's car never threatened or assaulted either defendant or

his wife during the road rage incident. Rather, according to the statement that defendant's wife gave the investigating officer, the passenger helped her to break up the fight. And, as I have observed above, the court properly instructed the jury on self-defense, which incorporated the concept of apparent necessity.

## B. Prosecutorial Misconduct

¶ 94 Defendant next asserts that the trial court abused its discretion because it allowed the prosecutor, during closing argument, to misstate the law of self-defense, to comment on defendant's right not to testify, and to shift the burden of proof to the defense.

¶ 95 I disagree because

- the prosecutor's comments did not misstate the law because they properly asked the jury to evaluate the concept of initial aggressor in the context of the evidence in the case;

- the prosecutor's comments about what defendant did and did not say focused solely on his interrogation by the investigating officer; the prosecutor did not refer,

explicitly or implicitly, to the fact that defendant had not testified during the trial;

- the prosecutor was entitled to comment on the lack of evidence, including what defendant did and did not say during the interrogation conducted by the investigating officer, *see People v. Welsh*, 176 P.3d 781, 788 (Colo. App. 2007); and

- the trial court properly instructed the jury on the prosecution's burden of proof, and the prosecutor did not say that defendant bore any burden during the trial, including the burden to prove that he had acted in self-defense.

## C.  Expert Opinion

¶ 96    Defendant asserts that the trial court committed plain error when, without any objection from defendant, it allowed a doctor to testify that the stab wound to the victim's face created a substantial risk of serious, permanent disfigurement.  Defendant further submits that the doctor's testimony usurped the jury's role in deciding whether the prosecution had proved, beyond a reasonable doubt, that the victim had suffered serious bodily injury.  This

occurred, defendant finishes up, because the doctor offered a legal opinion about whether the prosecution had proved one of the elements of second degree assault, with which defendant had been charged, as opposed to providing a medical diagnosis.

¶ 97    I disagree because

- the doctor testified that his opinion was based on his medical examination of the victim;

- "[w]hether an injury qualifies as a 'serious bodily injury' is a question of fact for the jury," *People v. Baker*, 178 P.3d 1225, 1233 (Colo. App. 2007);

- the trial court properly instructed the jury that it could accept or reject the doctor's testimony, *People v. Pahl*, 169 P.3d 169, 182 (Colo. App. 2006); and

- the doctor did not say that defendant was guilty or that he had caused the victim's injuries, *see People v. Rector*, 248 P.3d 1196, 1203 (Colo. 2011).

## D.  Merger

¶ 98    Defendant contends that, based on the Double Jeopardy Clause, his convictions for second and third degree assault should merge because third degree assault is a lesser included offense of

second degree assault. The prosecution concedes this contention because, under the facts of this case, there was only one victim and only one criminal act. *See People v. Baird*, 66 P.3d 183, 193 (Colo. App. 2002). After reviewing the record, I agree.

## III. Conclusion

¶ 99 I would affirm defendant's convictions for second and third degree assault. I would remand this case to the trial court to merge the conviction for third degree assault into the conviction for second degree assault and to amend the mittimus to show that defendant was only convicted of second degree assault.